(No. 82807.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BOBBY O. WILLIAMS, Appellant.

*Opinion filed July 6, 2000.—Rehearing denied October 2, 2000.*

4

MILLER, BILANDIC and RATHJE, JJ., specially concurring.
HARRISON, C.J., and HEIPLE, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Lawrence Bapst, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Robert Haida, State's Attorney, of Belleville (Barbara A. Preiner and Joel Bertocchi, Solicitors General, and William L. Browers, Colleen M. Griffin and Darryl B. Simko, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the judgment of the court:

Following a jury trial in the circuit court of St. Clair County, the defendant, Bobby O. Williams, was convicted of the first degree murder of Sharon Bushong. The same jury found defendant eligible for the death penalty. Fol-

lowing a hearing in aggravation and mitigation, the jury found that there were no factors sufficient to preclude imposition of the death penalty and sentenced defendant to death. Defendant's conviction and sentence have been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

## BACKGROUND

Shortly before 1 a.m. on November 3, 1994, Sharon Bushong was shot to death during a robbery of the Convenient Food Mart at 9618 West Main Street in Belleville, Illinois. At the time of her death, Bushong was working in the convenience store as the sole clerk. The principal pieces of physical evidence recovered from the crime scene were a surveillance videotape that had been recorded by the store's security cameras, and a spent cartridge case that had been fired from a .380-caliber pistol. Several fingerprints were collected from the convenience store, but none matched defendant's. In addition, a .380-caliber bullet was recovered from Bushong's body during her autopsy.

The surveillance videotape was played for the jury at trial and is part of the record on appeal. The videotape shows, simultaneously, the views from four cameras placed in different locations in the store. Two of the cameras are positioned behind the store's counter, providing views of the cash register. The videotape is recorded in black and white and has no sound. A date and time display is included on the tape.

The surveillance videotape shows two African-American males entering the convenience store at 12:49 a.m.[1] on November 3, 1994. One of the men is wearing shorts and a short-sleeve, dark-colored shirt with piping

---

[1]The time display on the videotape actually reads 1:49 a.m. The display was incorrect by one hour because it was still showing daylight savings time.

or thin stripes around the collar, shoulders, sleeves and bottom. He is wearing only one ankle-high sock. He is also wearing some type of light-colored garment, possibly boxer shorts, over his head. The second man is wearing a baseball cap, and is covering his face with his hands and shirt. Neither man's face is visible at any time.

The individual with the garment over his head can be seen on the videotape taking Bushong behind the store counter and then standing to Bushong's right as she opens the cash register drawer. After Bushong opens the drawer, the man raises his left hand and shoots Bushong in the head. Bushong immediately falls to the ground. The man then shifts the gun to his right hand and removes the money from the cash register drawer with his left hand. During this time, the second man, who is on the public side of the store counter, can be seen leaning over and reaching into a display rack filled with potato chips. After the shooter removes the money from the cash register, the two men leave the store.

Richard Vorder Bruegge, a forensic photographic examiner with the FBI, provided expert testimony regarding the surveillance videotape. Bruegge explained that, by using various analytical techniques, it is possible to determine the height of an individual in a photograph. Bruegge stated that he examined the surveillance videotape, and photographs made from the videotape, to determine the height of the shooter seen on the videotape. After describing his analysis to the jury, Bruegge stated that the results of his examination were consistent with a person whose height was six feet, one inch to six feet, two inches. Additional evidence presented at trial established that defendant's height is six feet, one inch. Testimony was also introduced which showed that defendant was left-handed.

On February 15, 1995, defendant was arrested in Washington Park, a town located north of Belleville in

St. Clair County. Two other individuals, Fred Jones and Andrew Towns, were arrested at the same time. At the time of his arrest, defendant was carrying a .380-caliber pistol in his jacket. James Hall, a forensic firearms examiner for the Illinois State Police, testified that both the cartridge case discovered in the convenience store and the bullet recovered from Bushong's body were fired from the .380-caliber pistol taken from defendant.

Rico Edwards, defendant's neighbor in Washington Park, testified that he had known defendant for approximately 18 years. Edwards stated that, in the middle of November 1994, he saw a .380-caliber pistol on the floor of defendant's car. In court, Edwards was shown the gun that was taken from defendant at the time of his arrest in February 1995. Edwards stated that it looked like the one he had seen in defendant's car, but he was not certain that it was the same one. Edwards also indicated that the people he associated with regularly exchanged guns.

Michael Cook testified that he had known defendant for approximately a year and that he knew defendant through Tony Turner, defendant's uncle. Cook stated that he had seen defendant with a .380-caliber pistol on four or five occasions during the summer of 1994. Cook also stated that the weapon taken from defendant at the time of his arrest, which was shown to Cook in court, looked like the one defendant had been carrying in the summer of 1994. Cook explained that the weapon looked like the one defendant had in 1994 because it was scraped and scratched around the front of the barrel, and because it had lost some of its black coloring at the tip of the barrel. Cook also positively identified the shirt which the shooter was wearing in the surveillance videotape as one that defendant had worn while playing basketball in the summer of 1994. In addition, Cook stated that he had seen defendant wearing just one sock while playing basketball.

On cross-examination, Cook said that he could not remember when he told police that he recognized the shirt worn by the shooter in the videotape, though he was certain that he had told them. Cook also acknowledged that he had not told the police that he had seen defendant wearing only one sock. Cook further stated that the people he associated with regularly traded guns.

Lavarro Jenkins testified that he saw defendant with a .380-caliber handgun in January 1995. According to Jenkins, defendant showed him the gun while the two of them were driving in a car in Belleville. In court, Jenkins identified the gun taken from defendant at the time of his arrest as the gun which defendant had shown him in January 1995. Jenkins stated that he knew it was the same gun because he had offered to buy it from defendant. Jenkins also testified that, while he and defendant were discussing the gun, defendant said "there's a hot one on it." Jenkins explained that this was a slang term meaning that the gun had been used in a murder. Jenkins further stated that, while driving down "the 90's part" of West Main Street in Belleville, he and defendant passed a convenience store. At that point, according to Jenkins, defendant reached over, pointed to the convenience store and said "that's one of them."

On cross-examination, Jenkins admitted that he had been convicted of theft over $10,000 for stealing a car. He also acknowledged that there were two felony forgery counts pending against him, though he stated that the State had not offered him anything in exchange for his testimony at defendant's trial. Jenkins also stated that defendant never said that he, himself, had "committed a hot one" with the .380-caliber pistol. Like the prior witnesses, Jenkins indicated that it was common for the people he associated with to exchange guns back and forth.

Fred Jones, a friend of defendant, testified for the

State pursuant to a plea agreement. Jones explained that, in exchange for his testimony, the State had agreed to dismiss a murder charge pending against him in St. Clair County and to recommend a 6- to 15-year sentence for armed robbery.

Jones testified that he saw defendant sometime after midnight on November 3 or November 4, 1994. At that time, defendant told him that he "and a couple more boys went up in Belleville to rob the convenience store and they shot the lady." Sometime after defendant told him about the murder, Jones saw that defendant was carrying a black, .380-caliber pistol. Jones identified the gun taken from defendant at the time of his arrest as the gun that defendant had with him in November 1994. Jones explained that he knew it was the same gun because he had seen defendant with it on several different occasions. Jones further stated that defendant called the gun his "Baby." Jones also identified the shirt worn by the shooter in the surveillance videotape as the one defendant was wearing when Jones saw him on November 3 or 4. In addition, Jones stated that, having played football with defendant, he knew that defendant was left-handed.

Jones was extensively cross-examined regarding six separate, conflicting statements which he had given to the police. In the first statement, given to police in early November 1994, Jones denied having any knowledge about the robbery of the Belleville convenience store or the murder of Bushong. The second statement was given to police on February 15, 1995, shortly after Jones was arrested, along with defendant, in Washington Park. In this statement, Jones again denied having any knowledge about the convenience store robbery or Bushong's murder. In the third statement, given on February 17, 1995, Jones said that he saw defendant "sometime after 11:00 p.m." on November 2, 1994, when defendant and

two other individuals, Carvon Jones and Ricardo Spratt, picked Jones up in defendant's car. Jones said in this statement that both defendant and Spratt had guns, though Jones did not identify the types of weapons they had. Jones again said nothing in the third statement about the convenience store robbery or Bushong's murder.

The fourth statement was given to police on March 29, 1995, after Jones had been charged in the St. Clair County murder that later formed the basis of Jones' plea agreement with the state. In this fourth statement, Jones said that defendant picked him up at about 9 or 9:30 p.m., and that defendant told him that he intended to go to Belleville to rob someone. Jones also indicated that, while defendant was driving him to work a couple of days after November 3, 1994, defendant said that he "shot the lady in Belleville." In the fifth statement, given to police on May 15, 1995, Jones stated that defendant picked him up around 11:30. Jones again stated that defendant told him about Bushong's murder while driving to work. The sixth statement was given to police on May 31, 1996, after Jones reached the plea agreement with the State. In this statement, which was similar to his direct testimony at trial, Jones made clear that Spratt and Carvon Jones were in the car with defendant when defendant said he robbed the convenience store in Belleville. Explaining the inconsistencies in the statements that he had given to the police, Jones stated that he had lied in his initial statements because he "was scared and didn't want to get [him]self no further involved in it." Jones also stated that the people he associated with exchanged guns back and forth.

Andrew Towns, defendant's cousin, testified that he remembered seeing defendant with a .380-caliber pistol in the early part of November 1994. Towns identified the gun taken from defendant at the time of his arrest as the

one which defendant had in November based on a worn area on the tip of the gun's barrel. Towns acknowledged that when he was arrested along with defendant in February 1995, he was carrying his father's .38-caliber gun. Towns stated that he was a juvenile at the time of his arrest and that no charges had been filed in relation to the .38-caliber weapon. Towns also stated that sometime around November 1994, he overheard defendant and Ricardo Spratt laughing when defendant said, "Don't forget the chips." Towns asked defendant what the phrase meant. Defendant told Towns that he "and some more people robbed a liquor store or convenience store. And while they were running out the store, [defendant] yelled, 'Don't forget the chips,' to another person." According to Towns, defendant also told him that "he shot the bitch" who worked at the convenience store. Towns also testified that he had seen defendant wearing a shirt like the one worn by the shooter in the surveillance videotape.

On cross-examination, Towns admitted that when he was first questioned by the police on February 15, 1995, he denied having any knowledge about the convenience store murder. Towns also acknowledged that he was questioned again by the police on March 8, 1995. On this occasion, Towns told the police that he had stolen from his father the .38-caliber weapon that he was carrying at the time of his arrest. The police, in turn, pointed out to Towns that the theft of the weapon was a crime. Subsequently, Towns told the police about defendant's statements regarding Bushong's murder. Towns acknowledged that he had been given immunity with respect to charges relating to the .38-caliber weapon, but he stated that the immunity was not given in exchange for his testimony. Towns also stated that he had seen defendant lend or trade his .380-caliber gun to defendant's uncle, Tony Turner.

The final witness for the State was Officer Calvin Dye of the Illinois State Police. Dye testified to the events surrounding defendant's arrest on February 15, 1999. On cross-examination, Dye was shown two photographs of Fred Hoffman, an early suspect in Bushong's murder. The pictures were taken on November 4, 1994, the day that Hoffman was arrested, and showed Hoffman wearing only one sock. Dye stated that this was significant because the shooter in the surveillance videotape was wearing only one sock.

Lucille Williams, defendant's grandmother and Andrew Towns' aunt, testified first for the defense. Williams stated that Towns did not have a good reputation for truthfulness in the community. Williams called Towns "a liar" and said that "other people say he be telling it the way the[y] want to hear it."

Carvon Jones testified that sometime early in November 1994, around midnight, he rode in defendant's car with defendant, Ricardo Spratt and Fred Jones. Carvon stated that, while in the car, he never heard defendant say anything about robbing a convenience store or shooting anyone. Carvon also stated that he saw Spratt and Fred Jones, but not defendant, carrying guns. Carvon indicated that the gun taken from defendant at the time of his arrest looked like the one that Spratt had been carrying, though he could not say that it was, in fact, the same gun.

On cross-examination, Carvon admitted that he had seen defendant with a .380-caliber gun in the past. He also acknowledged that in a statement given to the police in February 1995 he said that, while in the car in November 1994, Fred Jones had made a reference to "the white lady in Belleville."

The remainder of the defense's case consisted of brief testimony from various law enforcement officers. Thomas Gamboe, a forensic scientist with the Illinois State Po-

lice, stated that defendant's shoes did not match any of the footwear impressions found at the convenience store. Michael Harper, a Belleville police detective, testified that he recovered a spent, .380-caliber shell casing from Dewayne Willis' front porch. Orville Lester, a Belleville police officer, stated that he recovered a vehicle that police initially thought might have been used as the getaway vehicle in Bushong's murder. Finally, David Ellis, a Belleville police officer, testified that he transported defendant to the Belleville police station after his arrest in February 1995, and that defendant's street clothes, including his shoes, were taken from him.

After closing arguments, the jury was instructed on the alternative types of first degree murder. See 720 ILCS 5/9—1(a) (West 1994). The jury then returned a general verdict finding defendant guilty of the first degree murder of Sharon Bushong.

No testimony was presented at the eligibility phase of defendant's capital sentencing hearing. After arguments, the jury found the defendant eligible for the death penalty based upon two statutory aggravating factors: (1) murder in the course of another felony (720 ILCS 5/9—1(b)(6) (West 1994)); and (2) murder committed in a cold, calculated manner pursuant to a preconceived plan, scheme or design to take a human life (720 ILCS 5/9—1(b)(11) (West 1994)).

At the aggravation-mitigation phase of the sentencing hearing, the State introduced evidence that defendant had murdered a second individual, Carlos Robertson, shortly after murdering Bushong. Robertson's body was discovered by police in his Washington Park home in the afternoon of November 3, 1994. Robertson had been shot twice in the head with different guns. Ballistics evidence established that one of the guns used to kill Robertson was the same .380-caliber weapon that had been used to murder Bushong and that had been taken from defendant at the time of his arrest in February 1995.

Fred Jones testified again for the State at the aggravation-mitigation stage of sentencing. Jones stated that he had been charged in the murder of Carlos Robertson and that it was this offense which formed the basis of his plea agreement with the State. Jones also stated that he had known Robertson and had been preparing to move in with him before his murder. As he did at the guilt-innocence phase of trial, Jones explained that sometime after midnight, on November 3, 1994, defendant, Carvon Jones, and Ricardo Spratt picked Jones up in defendant's car. Jones stated that defendant picked him up because he wanted Jones to help "get [defendant] inside Carlos Robertson's house." According to Jones, defendant said that Robertson and two others, Ricardo Spratt and Gerald Simpson, had been with him when he robbed the convenience store in Belleville and "shot the lady." Defendant also said that Robertson and Simpson had driven off without him after the robbery and murder. After listening to defendant, Jones agreed to go with him to Robertson's house. At the house, Jones asked Robertson to open the door, while defendant and Spratt hid to the side. When Robertson opened the door, defendant and Spratt rushed in. Defendant and Spratt then shot and killed Robertson for having abandoned defendant at the Belleville convenience store.

Jones was cross-examined, as he was at the guilt-innocence phase of trial, regarding contradictory statements he had given to the police. Jones also admitted that it was only after reaching the plea agreement with the State that he fully explained the events surrounding Robertson's murder.

Howard Morgan, Bushong's father, read a victim impact statement to the jury. This concluded the evidence presented by the State in aggravation.

Carvon Jones testified for the defense in mitigation. As before, Carvon stated that, when he was in defendant's

car with defendant, Ricardo Spratt, and Fred Jones on November 3, 1994, he saw only Spratt and Fred Jones carrying guns. Carvon also stated that after the group drove to Carlos Robertson's house, only Spratt and Fred Jones got out of the car. According to Carvon, defendant never left the car.

Shermane Turner, defendant's mother, also testified in mitigation. Turner stated that defendant had been an average student who graduated from high school on time. Defendant entered the Marines right after high school with Turner's encouragement because she "didn't want [him] on the streets." About a year after entering the Marines, defendant was honorably discharged after he was diagnosed with asthma. According to Turner, defendant had no prior criminal record. Turner stated that the murder of Bushong was "out of character" for defendant and "just not like him."

In rebuttal, Sergeant Gregory Fernandez, of the Illinois State Police, stated that Carvon Jones had given an oral statement indicating that defendant had gotten out of his car at Carlos Robertson's house. However, when Carvon gave his written statement to police, he stated that defendant remained in the car.

Following arguments, the jury returned a verdict finding that there were no mitigating factors sufficient to preclude the imposition of the death penalty. This appeal followed.

## ANALYSIS

### I. Pretrial and Trial Issues

#### A. Speedy Trial

Defendant was arrested in connection with the murder of Carlos Robertson on February 15, 1995. He was charged with that offense on February 17, 1995, and indicted on March 17, 1995. Defendant was tried before a jury for Robertson's murder, but the jury was unable to

reach a verdict, and a mistrial was declared on July 18, 1996. On January 26, 1996, the St. Clair County grand jury returned an indictment charging defendant with the first degree murder of Sharon Bushong. Defendant was in continuous custody from the time he was arrested in February 1995 until the time he was charged with Bushong's murder.

Defendant alleges that his statutory right to a speedy trial was violated when the State delayed charging him with the murder of Bushong until January 1996. In support of this argument, defendant cites to the rule announced in *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981):

"Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained."

Defendant asserts that Bushong's murder arose from the "same facts" as the murder of Carlos Robertson because both murders stemmed from the robbery of the Convenient Food Mart. In addition, defendant maintains that the State knew, based on evidence available in February 1995, that the two offenses were related. According to defendant, continuances which he obtained in connection with the Robertson trial cannot be attributed to his trial for Bushong's murder. Therefore, according to defendant, the 120-day, statutory speedy-trial period (see 725 ILCS 5/103—5(a) (West 1996)) started, and expired, in the Bushong case months before these charges were filed.

This court has explained that, under the *Williams*

rule, the speedy-trial period will begin running on the later charge at the same time it begins running on the earlier charge only if the two charges are subject to compulsory joinder under section 3—3(b) of the compulsory joinder provisions of the Criminal Code of 1961 (720 ILCS 5/3—3(b) (West 1994)). *People v. Gooden,* 189 Ill. 2d 209 (2000). Because the *Williams* rule applies only when the new and original charges are subject to compulsory joinder, we must determine whether, in the case at bar, the charge of murdering Sharon Bushong was subject to compulsory joinder with the charge of murdering Carlos Robertson.

Section 3—3(b) of the Criminal Code of 1961 provides:

> "(b) If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, \*\*\* *if they are based on the same act.*" (Emphasis added.) 720 ILCS 5/3—3(b) (West 1992).

In this case, it is clear that the murder of Sharon Bushong and the murder of Carlos Robertson did not arise from the same act. The two crimes occurred at different times, in different places, involved different victims, and were driven by different motivations. That the shootings were related, under the State's theory of the case, does not alter this result. *People v. Mueller,* 109 Ill. 2d 378, 385 (1985) ("There is no requirement of joinder where multiple offenses arise from a series of related acts"). Consequently, because the charge of murdering Sharon Bushong was not subject to compulsory joinder with the charge of murdering Carlos Robertson, defendant's statutory right to a speedy trial was not violated.

### B. Gerald Simpson's Statement

Prior to trial, defendant filed a motion seeking permission to introduce into evidence a statement given to police by Gerald Simpson, a cousin and roommate of

Carlos Robertson. Shortly after police discovered Robertson's body on November 3, 1994, they questioned Simpson about his knowledge of the crime. Simpson initially denied knowing anything about the murder of Robertson or Bushong. However, on November 4, 1994, Simpson gave police a lengthy, written statement in which he admitted to being the second individual (the nonshooter) in the Convenient Food Mart the night that Bushong was murdered.

In his statement, Simpson explained that he, Carlos Robertson, and a man named "Fred" drove from Washington Park to Belleville around midnight on November 2, 1994. According to Simpson, Fred told him that they were going to Belleville to meet some women. When the group reached Belleville, Fred, who was driving, pulled into a convenience store. He then told the others that he was going to rob the store. Simpson asked him whether he was "for real." Fred started laughing and told Simpson to "come on." Fred and Simpson got out of the car while Robertson stayed behind. Fred put something that looked liked boxer shorts over his head, and told Simpson to "look out for him" as he and Simpson entered the store. Once they were inside the store, according to Simpson, "Fred started behind the counter and told the white girl to open up the cash register. The white girl opened up the cash register, Fred shot the white girl once, *** in the head. She fell to the floor and Fred took the money out of [the] cash register. Fred stuffed all of the money into his pants pocket." While Fred was robbing the store, Simpson tried to cover his face with his hands because he had seen a security camera when he entered the store. After robbing the store, Fred, Simpson and Robertson returned to Washington Park. Later, Fred murdered Robertson after the two had an argument.

Although Simpson did not say in his statement to the police what "Fred's" last name was, the record indicates that he subsequently identified Fred Hoffman as the in-

dividual who shot Bushong. Fred Hoffman was arrested by police for Bushong's murder but was not indicted, because, among other reasons, he was too short to match the height of the shooter in the surveillance videotape as determined by the FBI.

On November 7, 1994, Simpson gave another statement to the police. In this statement, Simpson again admitted to being at the Convenient Food Mart on the night that Sharon Bushong was murdered. However, on this occasion, Simpson explained that it was not "Fred" who shot Bushong, but rather Dewayne Willis. Willis is identified in the record as another roommate of Carlos Robertson. Willis was never charged in Bushong's murder because police believed he had a firm alibi.

Prior to trial, defendant filed a motion seeking permission to introduce into evidence the statement in which Simpson identifies "Fred" as the murderer of Bushong. According to defendant, the statement was admissible under the statement-against-penal-interest exception to the hearsay rule. Following argument, the trial court denied defendant's motion. Defendant now contends that the trial court erred in excluding Simpson's statement.

The general rule is that a third party's out-of-court statement that he committed a crime is hearsay and is inadmissible, even though the statement is against the declarant's penal interest. *People v. Tate*, 87 Ill. 2d 134, 143 (1981). However, where justice requires, and where there are sufficient indicia of reliability, such statements may be admitted under the statements-against-penal-interest exception to the hearsay rule. *People v. Bowel*, 111 Ill. 2d 58, 66 (1986), citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049 (1973). To determine whether a statement contains sufficient indicia of reliability, we look foremost to whether the statement is self-incriminating and against

the declarant's interest. *People v. Keene*, 169 Ill. 2d 1, 29 (1995). We also look to whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred; whether the statement was corroborated by other evidence; and whether there was adequate opportunity for cross-examination of the declarant. These latter factors "are indicia, not hard and fast requirements," and they need not all be present for a statement to be admitted. *People v. House*, 141 Ill. 2d 323, 390 (1990), citing *Bowel*, 111 Ill. 2d at 67; *Keene*, 169 Ill. 2d at 29. Ultimately, the question to be considered in deciding the admissibility of the statement is whether it was "made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Bowel*, 111 Ill. 2d at 67, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. Whether a statement is admissible under the statement-against-penal-interest exception to the hearsay rule is within the sound discretion of the trial court. *Bowel*, 111 Ill. 2d at 68.

The circumstances surrounding a statement may play an important role in determining whether the statement was actually against the declarant's penal interest when made. See generally 2 J. Strong, McCormick on Evidence § 319(c), at 345 (4th ed. 1992). The record in the present case, however, gives us little indication of the circumstances under which Simpson's statement was made. Accordingly, our analysis is limited primarily to an examination of the statement itself.

In the statement which Simpson gave to police on November 4, 1994, he admitted driving to the Belleville convenience store with Bushong's murderer. He also admitted that "Fred" told him he was going to rob the store, and that "Fred" told Simpson to "look out for him" when they entered the store. Simpson also admitted to being in the Convenient Food Mart when the rob-

bery and murder took place and to witnessing both events. Thus, in his November 4 statement, Simpson clearly implicated himself in the armed robbery of the convenience store and Bushong's murder. Indeed, as defendant points out, Simpson was charged and tried for Bushong's murder. And, at that trial, the prosecutor introduced Simpson's statement into evidence in an attempt to secure a conviction.[2] In light of the foregoing, we conclude that portions of Simpson's statement, on their face, were self-incriminating and against the declarant's penal interest.

Our conclusion that portions of Simpson's statement were against his penal interest does not complete our analysis. At trial, defendant did not seek to admit only those portions of Simpson's statement in which Simpson admitted to being present at the Convenient Food Mart. Rather, what defendant sought to have admitted were Simpson's statements identifying "Fred" as Bushong's murderer. These statements, however, were not directly against Simpson's penal interest. Thus, we must determine whether the fact that Simpson's statements naming "Fred" as Bushong's murderer are collateral to Simpson's other, self-inculpatory statements affects their admissibility under the exception for statements against penal interest.

Commentators and authorities have taken differing views as to whether statements that are collateral to self-inculpatory declarations should be admissible under the statement-against-penal-interest exception to the hearsay rule. Compare, *e.g.*, 5 J. Wigmore, Wigmore on Evidence § 1465, at 339 (Chadbourn rev. ed. 1974) ("[s]ince the principle is that the statement [against interest] is made under circumstances fairly indicating the declarant's

---

[2]The jury in that trial was unable to reach a verdict and a mistrial was declared. The record does not indicate whether Simpson was tried again.

sincerity and accuracy \*\*\*, it is obvious that the situation indicates the correctness of whatever he may say while under that influence"), and 2 J. Strong, McCormick on Evidence § 319(b), at 344 (4th ed. 1992) ("When a statement both incriminates the declarant and exculpates the accused, complete rejection of related or contextual statements is not required"), with *Williamson v. United States*, 512 U.S. 594, 129 L. Ed. 2d 476, 114 S. Ct. 2431 (1994) (Federal Rule of Evidence 804(b)(3) allows trial courts to admit, as a hearsay exception, only those statements which are themselves self-inculpatory). In the present case, we need not decide which view to adopt because even if we accept that there may be instances in which collateral statements should be admitted, this is not such a case.

Those commentators and authorities which have endorsed the admission of collateral statements under the statements-against-penal-interest exception to the hearsay rule have recognized that not all collateral statements should be admitted. See, *e.g.*, 2 J. Strong, McCormick on Evidence § 319(b), at 344 (4th ed. 1992) ("a rather tight integration" between a statement incriminating the declarant and exculpating the accused may be required for admissibility of the latter); 5 J. Wigmore, Wigmore on Evidence § 1465, at 339 (Chadbourn rev. ed. 1974) (the limits to the rule that collateral statements may be admitted "must be largely a matter of judgment in each case"); *Buckley v. Cronkhite*, 74 Ill. App. 3d 487, 492 (1979) (collateral statement must be "substantially connected" with declaration against interest). One of the recognized limitations imposed upon the admission of collateral statements is that the collateral statements must be neutral in character, rather than self-serving. See C. McCormick, McCormick on Evidence § 256, at 552 (1954) ("[a] certain latitude as to contextual statements, neutral as to interest, giving meaning to the declaration

against interest seems defensible, but bringing in self-serving statements contextually seems questionable"). In the instant case, each of Simpson's pertinent references to "Fred" was self-exculpatory. Paraphrasing, Simpson stated that "Fred, not I, decided to rob the convenience store"; that "Fred, not I, took the money"; and that "Fred, not I, shot the clerk." Thus, because these statements were self-exculpatory, they were properly found inadmissible, despite their connection to Simpson's other, self-inculpatory statements.

We note, in addition, that there is absolutely nothing in the record to corroborate Simpson's statements that "Fred" murdered Bushong. Fred Hoffman was rejected as a viable suspect because he was too short. On November 7, Simpson himself stated that Bushong was murdered *not* by "Fred" but by a man named Dewayne Willis. Given these facts, it cannot be said that Simpson's assertions that "Fred" was the murderer were "made under circumstances that provide 'considerable assurance' of [their] reliability by objective indicia of trustworthiness." *Bowel*, 111 Ill. 2d at 67, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.

Defendant notes that Simpson's statement of November 4 was read, in its entirety, to the jury at Simpson's own trial for Bushong's murder. He argues that if the statement was admissible in its entirety in that case, then it should be admissible in its entirety here. The State, however, was not using Simpson's statement to establish the identity of the shooter at Simpson's trial. Rather, the State was attempting to prove Simpson's accountability for the murder. The reliability of Simpson's identification of "Fred" as the shooter was simply not at issue. See also *People v. Ward*, 154 Ill. 2d 272, 312-13 (1992) (whether a statement is admissible under the statement-against-penal-interest exception is an analyti-

cally distinct question from whether the statement is admissible as a party admission); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 802 (7th ed. 1999) (same). Accordingly, in the case at bar, we find no error in the trial court's decision to exclude Simpson's statements that "Fred" shot Bushong.

### C. Sufficiency of the Evidence

Defendant argues that the evidence produced at trial was insufficient to prove him guilty of first degree murder beyond a reasonable doubt. Defendant maintains that the State proved only that, at the time of his arrest, defendant possessed the weapon that shot Bushong. No credible evidence, defendant argues, placed him in the store at the time of the murder and robbery, and no credible evidence proved defendant actually murdered Bushong.

A criminal conviction will be set aside, based upon an insufficiency of the evidence, only when the evidence that was presented at trial is so unreasonable, improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *People v. Smith*, 141 Ill. 2d 40, 55 (1990). Upon review, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

Defendant's challenge regarding the sufficiency of the evidence is directed primarily at the testimony of three State's witnesses: Lavarro Jenkins, Fred Jones and Andrew Towns. Defendant contends that the testimony of each of these witnesses was impeached and that each witness had a motive to provide the police with evidence implicating defendant in Bushong's murder.

Defendant asserts, for example, that Jenkins' testimony lacks credibility because he stole a car in February 1995, and because, at the time of trial, there were two

felony charges pending against him. With respect to Fred Jones, defendant points out that at the time Jones testified, he was incarcerated on a charge of first degree murder. Jones admitted that, in exchange for his testimony in this case, the State would dismiss the murder charge and Jones would plead guilty to the lesser offense of armed robbery. Defendant further notes that Jones' statements to police changed frequently and that Jones implicated defendant in the robbery and in Bushong's murder only after Jones was charged with murder and had retained a lawyer. Lastly, defendant points out that Andrew Towns also told the police conflicting stories. Towns did not reveal that defendant had implicated himself in the murder until after the police had informed Towns that he could be charged with a weapons violation for having stolen his father's .38-caliber handgun.

It is the function of the jury, as the trier of fact, to determine the credibility of witnesses and the weight to be given their testimony. *People v. Tye*, 141 Ill. 2d 1, 13 (1990). Here, the jury was given this opportunity, as the biases and inconsistent statements of Jones, Towns and Jenkins were fully aired. Moreover, we have carefully reviewed the testimony of each witness and we cannot say that it is so unreasonable or unsatisfactory as to be unworthy of belief.

Having found no reason to disturb the jury's implicit findings of credibility regarding the State's principal witnesses, we conclude that the evidence was sufficient to support the jury's verdict. Jones and Towns both testified that defendant admitted to Bushong's murder. Jones testified that, shortly after the murder, defendant told him that he "and a couple of boys went up in Belleville to rob the convenience store and they shot the lady." Towns testified that defendant told him he had robbed the store and that "he shot the bitch" who worked at the store.

In addition, as defendant concedes, the weapon found in defendant's possession at the time of his arrest was the weapon used to murder Bushong, and several witnesses testified that defendant was in possession of that gun both before and after Bushong's murder. The evidence also showed that defendant is the same height as the murderer and that both defendant and the murderer are left-handed.

Viewing the evidence described above in a light most favorable to the State, we conclude that the State met its burden. The evidence was sufficient to support the jury's verdict finding defendant guilty of first degree murder.

### D. Impeachment of Andrew Towns

At the close of the State's case, defense counsel informed the trial court that she planned to impeach the testimony of Andrew Towns through the testimony of defendant's grandmother, Lucille Williams. According to counsel, Williams would have testified that she heard Towns state, while he was in her front yard talking to some friends, that he was receiving $200 "to testify." The trial court refused to allow Williams' testimony. The court ruled that defense counsel had failed to lay the proper foundation necessary to introduce the allegedly impeaching statements.

Defendant contends that the court's ruling constitutes both a denial of defendant's due process rights and an abuse of the trial court's discretion. The State, in response, maintains that defendant's argument is procedurally barred because defendant neglected to include the court's ruling in defendant's post-trial motion.

We agree with the State. To preserve an error for review, a defendant must raise a timely objection at trial and identify the alleged error in a written post-trial motion. *People v. Miller*, 173 Ill. 2d 167, 191 (1996). Failure to meet these requirements constitutes a procedural default of the purported error. *Miller*, 173 Ill. 2d at 191.

Nevertheless, pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), this court may review an argument not properly preserved if we conclude that plain error affecting a substantial right has occurred. *People v. Shaw*, 186 Ill. 2d 301, 326-27 (1998). Before invoking the plain error exception, however, "it is appropriate to determine whether error occurred at all." *People v. Wade*, 131 Ill. 2d 370, 376 (1989).

As the State points out, no error of any kind occurred because the supposedly impeaching testimony of Lucille Williams did not exist. At trial, defense counsel conceded that when he spoke to Williams outside the courtroom prior to the introduction of her testimony "she indicated that she [did] not know what the topic of [Towns'] conversation was." While Williams was still certain that Towns had said something about receiving $200, she was no longer certain that Towns had said he was receiving $200 "to testify."

There was no error in the trial court's refusal to admit Williams' testimony. Consequently, we also find no plain error and no basis to excuse defendant's procedural default.

## II. Sentencing Issues

### A. Cold, Calculated and Premeditated Aggravating Factor

Defendant was found eligible for the death penalty pursuant to section 9—1(b)(11) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(11) (West 1994)). Section 9—1(b)(11) provides for death eligibility where the defendant was 18 years or older at the time of the murder and where:

"[T]he murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9—1(b)(11) (West 1994).

Defendant challenges the constitutionality of section 9—1(b)(11). Defendant also maintains that the evidence produced at trial was insufficient to support a finding of death eligibility under section 9—1(b)(11).

1. Constitutionality of Section 9—1(b)(11)

In Illinois, the statutory aggravating factors perform the constitutionally required task of "channeling and limiting" the sentencer's discretion to impose the death penalty. *Maynard v. Cartwright*, 486 U.S. 356, 362, 100 L. Ed. 2d 372, 380, 108 S. Ct. 1853, 1858 (1988). The aggravating factors work to remove the risk of arbitrary and capricious sentencing by providing an objective, " 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia*, 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932 (1976), quoting *Furman v. Georgia*, 408 U.S. 238, 313, 33 L. Ed. 2d 346, 392, 92 S. Ct. 2726, 2764 (1972) (White J., concurring). Under the eighth amendment, a statutory aggravating factor must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742 (1983). Defendant maintains that section 9—1(b)(11) fails this test.

Defendant contends that the language of section 9—1(b)(11), which is focused on the concept of premeditation, does little more than describe the *mens rea* of an intentional murder. In support of this contention, defendant notes that, in *People v. Stewart*, 105 Ill. 2d 22 (1984), this court found no error in a trial court's definition of the term "premeditation" as " '[a] prior determination to do an act, but such determination need not exist for any particular period before it is carried into effect.' " *Stewart*, 105 Ill. 2d at 73. Defendant asserts that this

definition of premeditation, because it requires no period of deliberation or reflection, is no different from the statutory definition of the term "intent" set forth in the Criminal Code: "A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4—4 (West 1996). Thus, according to defendant, the language of section 9—1(b)(11), on its face, effectively permits a finding of death eligibility in all cases of first degree, intentional murder. Therefore, in defendant's view, section 9—1(b)(11) fails to genuinely narrow the class of individuals eligible for the death penalty and is unconstitutional.

The definition of premeditation approved of in *Stewart* was taken from a Pennsylvania decision, *Commonwealth v. Dreher*, 274 Pa. 325, 326, 118 A. 215, 216 (1922). Pennsylvania is one of several states which, early in their history, adopted a statutory definition of murder that divides murder into first and second degrees and that defines first degree murder as "willful, deliberate and premeditated." 18 Pa. Cons. Stat. § 2502 (1999); see generally Annotation, *Modern Status of the Rules Requiring Malice "Aforethought," "Deliberation," or "Premeditation," as Elements of Murder in the First Degree*, 18 A.L.R.4th 961 (1982); 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.7(a), at 237-41 (1986). In most states which distinguish degrees of murder as Pennsylvania does, the term "premeditation" has evolved, through a process of judicial interpretation, into a legal term of art meaning nothing more than " 'having made the choice to kill.' " *Smith v. State*, 41 Md. App. 277, 321, 398 A.2d 426, 450 (1979).[3] Defendant is therefore correct, in a technical sense, when he argues that every

---

[3]The process by which the statutory term "premeditation"

intentional murder is premeditated: "When there is the formation of a specific intent to kill or 'a definite purpose to kill,' there has been, of necessity, time for the formation of such specific intent or such 'definite purpose to kill' to wit, 'premeditation.' One cannot form a purpose without having had time to form that purpose." *Smith*, 41 Md. App. at 308, 398 A.2d at 444.

However, this court has repeatedly rejected the argument that section 9—1(b)(11) requires proof of nothing more than the technical premeditation which accompanies every first degree, intentional murder. *People v. Munson*, 171 Ill. 2d 158, 191 (1996), *People v. Macri*, 185 Ill. 2d 1, 52-53 (1998); *People v. Haynes*, 174 Ill. 2d 204, 254-55 (1996); *People v. Williams*, 173 Ill. 2d 48, 89-90 (1996). In so holding, this court has stressed that section 9—1(b)(11) requires proof not only of cold, calculated premeditation, but also proof that the murder was committed "pursuant to a preconceived plan, scheme or design" (720 ILCS 5/9—1(b)(11) (West 1994)). In *Munson*, the court explained that section 9—1(b)(11) performs the constitutionally required task of narrowing the class of murder defendants to those who justifiably deserve a more severe sentence, because it "pertains to the intent to murder pursuant to a particular plan, scheme or design. It is not simply the intent to commit murder. As such, this factor is not present in every murder case. Thus, *** [section 9—1(b)(11)] does place the necessary restraint on the sentencer's discretion to impose death." *Munson*, 171 Ill. 2d at 191.

Although this court has been consistent in holding

---

came to be equated with actual intent occurred in much the same way that the common law term "malice aforethought" was reduced to actual intent. See, *e.g.*, *Smith*, 41 Md. App. at 308-22, 398 A.2d at 444-50; J. Knudson, *Murder by the Clock*, 24 Wash. U. L.Q. 305 (1939); R. Perkins, *A Re-examination of Malice Aforethought*, 43 Yale L.J. 537 (1934); see also 720 ILCS Ann. 5/9—1, Committee Comments—1961, at 9-13 (Smith-Hurd 1993).

that section 9—1(b)(11) requires proof of a preconceived plan, scheme or design to warrant a finding of death eligibility, and consistent in holding that the "preconceived plan, scheme and design" language is critical to the constitutionality of the statute, the court has never explicitly stated what is meant by that phrase. Clearly, as *Munson* held, to murder pursuant to a preconceived plan, scheme or design means something more than merely forming the intent to murder. Otherwise, section 9—1(b)(11) would apply to all first degree, intentional murders. What then must the State show to establish that a murder has been committed pursuant to a preconceived plan, scheme or design?

When used in their plain and ordinary sense, words such as "premeditate and design *** import forethought, careful reflection, deliberately arranged purpose—ideas all involving, in their structures, the essential element of *time*." Park. Cr. Rep. 347, 358 (N.Y. Sup. Ct. 1852) (Roosevelt, J., concurring). In common usage, a phrase such as "wilful, deliberate and premeditated malice aforethought" clearly "impl[ies] the mental process involved where a matter has been pondered over for a substantial period of time" R. Perkins, *A Re-examination of Malice Aforethought*, 43 Yale L.J. 537, 538 (1934). The plain language of section 9—1(b)(11), which posits not merely a cold, calculated and premeditated murder, but also one committed pursuant to a preconceived plan, scheme or design, strongly indicates that time is an essential element of the aggravating factor and that proof of a substantial period of reflection or deliberation is required to render a defendant death eligible.

Consistent with this language, prior decisions from this court have adhered to the principle that a murder which is committed pursuant to "a preconceived plan, scheme or design" is one which is thought out well in advance of the crime. For example, in *People v. Macri*,

185 Ill. 2d 1 (1998), this court upheld a finding of death eligibility under section 9—1(b)(11) where the defendant murdered the victim with a crowbar. *Ten months* prior to the murder, the defendant told a friend that he "intended to hit [the victim] over the head with a crowbar, rape her, steal her car, and escape to New York City, all of which eventually transpired." *Macri*, 185 Ill. 2d at 54.

Similarly, in *People v. Haynes*, 174 Ill. 2d 204 (1996), this court upheld a finding of death eligibility under section 9—1(b)(11) where the defendant "coldly and meticulously planned the murder" of a plastic surgeon over *a period of days. Haynes*, 174 Ill. 2d at 255. Evidence showed that the defendant had decided to murder a plastic surgeon in order to " 'strike out' against the perpetrators of 'fake Aryan cosmetics.' " *Haynes*, 174 Ill. 2d at 255. The defendant had selected a surgeon from the yellow pages of the telephone book and, "a few days prior" to the crime, had made an appointment under a false name. The defendant had gone to the surgeon's office with the purpose of carrying out his plan and then had waited to commit the murder until he was in the office with the surgeon to ensure that he was murdering the right man. *Haynes*, 174 Ill. 2d at 255-56.

The time of deliberation was critical to this court's decision in *People v. Williams*, 173 Ill. 2d 48 (1996). In that case, the evidence established that the defendant threatened to kill his former girlfriend, Michelle, and her companion, Anthony. The next day, the defendant saw Michelle and Anthony together and became upset. Later that day, the defendant took a loaded gun and drove to Michelle's house. He then hid behind a tree, waited for Michelle to emerge, and then shot and murdered her. This court upheld the finding of death eligibility under section 9—1(b)(11), stating:

"These facts demonstrate that defendant's actions were not spontaneous. The sentencer could find that defendant murdered Michelle *after much thought and reflection*. De-

fendant had *ample time for reflection the previous day* after he threatened Michelle and Anthony and attacked them with a knife. Defendant had *more time for reflection* after he again saw Michelle and Anthony together at the mall the next afternoon. Defendant's actions in driving home and then proceeding to Michelle's house later that evening with a loaded gun show that defendant *contemplated this murder well in advance.* We find that this evidence supports the trial court's determination that defendant murdered Michelle in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design ***." (Emphasis added.) *Williams,* 173 Ill. 2d at 91.

In *People v. Brown,* 169 Ill. 2d 132, 166 (1996), the court upheld a finding of death eligibility under section 9—1(b)(11) where the defendant, a gang member, formed "a plan to go to a particular location for the purpose of killing members of a rival gang." Almost *three hours* after first devising the plan, and after steps were taken in furtherance of the plan, including obtaining a rental car, the murder was carried out. *Brown,* 169 Ill. 2d at 166-67.

As these decisions illustrate, this court has required a substantial period of reflection or deliberation to establish death eligibility under section 9—1(b)(11). This interpretation of the statute is supported by the legislative history of section 9—1(b)(11). The cold, calculated and premeditated aggravating factor was not part of the original Illinois death penalty statute enacted in 1977. See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b). The factor was originally adopted by the General Assembly in 1987 (see 85th Ill. Gen. Assem., House Bill 1567, 1987 Sess.). However, that action was vetoed by Governor James Thompson, who concluded that the cold, calculated and premeditated aggravating factor was unconstitutionally vague. See 85th Ill. Gen. Assem., House Proceedings, October 22, 1987, at 132-33 (statements of Representative Countryman). The General Assembly successfully enacted the aggravating factor in 1989. Pub. Act 86—

834, eff. September 7, 1989 (adding 720 ILCS 5/9—1(b)(11)).

Throughout the legislative debates on the cold, calculated and premeditated aggravating factor, concerns were raised about its constitutionality. Much like defendant in the case at bar, those legislators who spoke in opposition to the aggravating factor maintained that the language of the factor was vague and undefined, and that it could potentially apply to every defendant convicted of first degree murder. See 86th Ill. Gen. Assem., House Proceedings, June 16, 1989, at 69-71 (statements of Representative Countryman); 85th Ill. Gen. Assem., House Proceedings, June 29, 1987, at 57-59 (statements of Representative Johnson). In response, the supporters of the aggravating factor defended its constitutionality by arguing that, because of the "preconceived plan, scheme or design" language, it would apply only to murders in which "there is a substantial qualitative difference" from other murders. 85th Ill. Gen. Assem., House Proceedings, June 29, 1987, at 59 (statements of Representative McCracken). Representative Petka explained:

> "*This provision is intended to apply to those situations in which a defendant basically takes the life of another person after deliberating upon it for extended periods of time.* It is not widely known, but many of the crimes in which the death penalty is now eligible, basically are crimes which are committed as an after-thought on a murder [*sic*] that is committed in after-thought to a forceable felony. For example, back in the County of Will, in a case that I personally tried myself, a defendant jumped on a drunk who was staggering out of a bar at two o'clock in the morning and beat him up and knocked him unconscious and as a result, he died. Because there was a robbery connected with this, he was eligible for the death penalty and received it [See *People v. Owens*, 102 Ill. 2d 88 (1984)]. However, in another instance in which a defendant found out that his wife was cheating on him, *he laid in ambush for approximately one week waiting for the ideal time,* shot the

victim a couple of times and then doused him entirely with gasoline and after he was doused in gasoline, the defendant [*sic*]... the victim expired. That type of case was not eligible for the death penalty and it seems that's an anomaly in the law that needs to be corrected. This is exactly what this Section is intended to remedy and I move for concurrence." (Emphasis added.) 85th Ill. Gen. Assem., House Proceedings, June 29, 1987, at 55-56 (statements of Representative Petka).

Senator Barkhausen also explained:

"As I mentioned in my opening remarks, Florida has, as part of its death penalty, the aggravating factor that a murder was committed in a cold, calculated and premeditated manner, and that has been upheld. But in addition, what we would be adding here, *not only requires that factor, but in addition, the qualifying language pursuant to a preconceived plan, scheme or design to take a human life.* So what we are talking about here is not only cold, calculated and premeditated, but a—a preconceived plan whereby an individual say, decides to commit a murder by torture, and *thinks it out well in advance.*" (Emphasis added.) See 86th Ill. Gen. Assem., Sen. Proceedings, June 26, 1989, at 62 (statements of Senator Barkhausen).

See also 85th Ill. Gen. Assem., House Proceedings, June 29, 1987, at 59 (statements of Representative Mc-Cracken) (the aggravating factor requires the "penultimate intentional act" of forming a plan, scheme or design).

As Senator Barkhausen's remarks indicate, the Illinois legislators intended to distinguish the language of the cold, calculated and premeditated aggravating factor from the language of a similar factor enacted by the State of Florida. The Florida aggravating factor, which was frequently mentioned by the Illinois legislators, allowed a finding of death eligibility if the murder was committed in a "cold, calculated and premeditated manner without any pretense of moral or legal justification" (Fla. Stat. § 921.141(5)(i) (1981)). As early as 1984, the Florida Supreme Court had clarified the Florida aggravating fac-

tor, holding that the statute incorporated a "heightened premeditation" standard. *Preston v. State*, 444 So. 2d 939, 946-47 (Fla. 1984). As the Florida Supreme Court explained, "[t]he level of premeditation needed to convict in the guilt phase of a first-degree murder trial does not necessarily rise to the level of premeditation required in section 921.141(5)(i). This aggravating circumstance has been found when the facts show a particularly lengthy, methodic, or involved series of atrocious events or a substantial period of reflection and thought by the perpetrator." *Preston*, 444 So. 2d at 946. The legislators in the General Assembly who spoke in support of Illinois' cold, calculated and premeditated aggravating factor were consistent in pointing out that, by including the phrase "preconceived plan, scheme or design," they were intending to make the language of Illinois' factor clearer than Florida's. Indeed, by using the "preconceived plan, scheme or design" language, the Illinois legislators were essentially adopting, by statute, Florida's judicially created, heightened premeditation standard. See *Macri*, 185 Ill. 2d at 56-57 (holding it unnecessary to follow Florida's heightened premeditation standard because of the "preconceived plan, scheme or design" language contained in section 9—1(b)(11)).

The General Assembly carefully sought to eliminate the possibility of arbitrary and capricious imposition of the death penalty under section 9—1(b)(11) by qualifying the term "premeditated"—which could potentially apply to all first degree, intentional murders—with the "preconceived plan, scheme or design" language. The legislature's unequivocal intent was to limit the application of section 9—1(b)(11) to those defendants who commit a murder after an extended period of deliberation. In the legislature's considered opinion, a defendant who contemplates a murder for a substantial period of time, yet still commits it, is set apart from other murder

defendants in a meaningful way and is a defendant "with a malignant heart who must be permanently eliminated from society." *People v. Carlson*, 79 Ill. 2d 564, 590 (1980).

Thus, to establish that a murder defendant is death eligible under section 9—1(b)(11), the State must prove more than that the murder was technically premeditated. Section 9—1(b)(11) requires that the murder be "cold," *i.e.*, not motivated by mercy or the emotion of the moment, and that it be "calculated and premeditated, pursuant to a preconceived, plan, scheme or design," *i.e.*, deliberated or reflected upon for an extended period of time. When section 9—1(b)(11) is read and applied in this plain and ordinary sense, as our prior decisions have done, the factor properly narrows the class of death eligible defendants and provides a " 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia*, 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932 (1976), quoting *Furman v. Georgia*, 408 U.S. 238, 313, 33 L. Ed. 2d 346, 392, 92 S. Ct. 2726, 2764 (1972) (White, J., concurring). Accordingly, defendant's argument that section 9—1(b)(11) is unconstitutional must fail.

### 2. Sufficiency of the Evidence

Defendant argues that the evidence produced at trial was insufficient to prove, beyond a reasonable doubt (720 ILCS 5/9—1(f) (West 1994)), that he was eligible for the death penalty under section 9—1(b)(11). The State, in turn, contends that this issue has not been properly preserved because it was not set forth with specificity in defendant's post-trial motion. As the State points out, the pertinent portion of defendant's post-trial motion states only that the trial court and jury "erred in sentencing the defendant to death." However, we believe that it is appropriate to reach the merits of this issue, regard-

less of the specificity of defendant's post-trial motion, because defendant's argument relates to the sufficiency of the evidence, one of the three types of error that need not be raised in a post-trial motion. *Keene*, 169 Ill. 2d at 10.

The State contends that two facts support the finding of death eligibility under section 9—1(b)(11). First, the time display on the surveillance videotape shows that just under one minute elapsed from the time the two assailants entered the store until the time they left. According to the State, the fact that the murder occurred quickly indicates that it was planned in advance. Second, Bushong did not physically resist defendant during the robbery. This fact is significant, in the State's view, because unless defendant had intended to kill Bushong "all along, [there was no point in] deliberately shooting her after she had complied with his demands and stood to the side unthreateningly." Thus, according to the State, the speed of the murder, and Bushong's cooperation in opening the cash register, are sufficient to support the jury's finding that the murder was committed "in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design." We disagree.

There is no evidence that defendant deliberated over the murder of Bushong for an extended period of time, as is required under section 9—1(b)(11). Although two witnesses, Fred Jones and Andrew Towns, both testified that, after the fact, defendant admitted murdering Bushong, neither witness' testimony established or suggested that defendant considered killing Bushong "well in advance" (*Williams*, 173 Ill. 2d at 91) of the crime. Moreover, the circumstantial evidence upon which the State relies, *i.e.*, the fact that the murder occurred quickly once the assailants entered the store, and that Bushong did not physically resist defendant, does not show that

defendant engaged in a substantial period of reflection. At most, the evidence to which the State points suggests that defendant had formed an intent to murder Bushong at the time he entered the store or, in other words, approximately one minute before the murder occurred. This is not a case where the manner in which the murder was committed was so particular or exacting that, by its very nature, the murder must have been deliberated upon for an extended period of time. *Cf. People v. Lenius*, 293 Ill. App. 3d 519 (1997) (defendant found death eligible under section 9—1(b)(11) after murdering the victim with a complex, homemade bomb). To suggest that a plan to kill Bushong had been formed some time well in advance of defendant's arrival at the store is merely to speculate.

The case at bar is similar to *Thompson v. State*, 456 So. 2d 444 (Fla. 1984). In *Thompson*, the defendant was convicted of the murder of a gas station attendant. The evidence at trial established that the defendant had "demanded money from the victim, whereupon the victim stated that he had no money, laughed, and raised a chair in front of himself. At that point, [the defendant] fired [a] shotgun, killing the victim, and [the defendant and a companion] fled the scene without consummating the robbery." *Thompson*, 456 So. 2d at 445. At trial, three witnesses testified that they discussed robbing the gas station with the defendant hours before the murder took place.

The trial court concluded that the defendant's decision to murder the unarmed gas station attendant instead of leaving the scene after being told there was no money rendered the defendant death eligible under Florida's cold, calculating and premeditated aggravating factor. The Florida Supreme Court disagreed, stating:

"No evidence was produced to set the murder apart from the usual hold-up murder in which the assailant becomes frightened *or for reasons unknown* shoots the victim either before or during an attempt to make good his escape. None

of the numerous witnesses testified or even suggested that the discussions they held with the appellant concerning the robbery contemplated the murder of the station attendant. \*\*\* For the purpose of sentencing, the evidence does not prove beyond a reasonable doubt the heightened degree of premeditation, calculation, or planning which we have consistently held is required to in order to find this aggravating circumstance." (Emphasis added.) *Thompson*, 456 So. 2d at 446-47.

See also *People v. Andrews*, 132 Ill. 2d 451, 465-66 (1989) (error to impose an extended-term sentence for murder where, during an armed robbery, the victim was defenseless and did not resist, but the defendant nevertheless shot the victim in the head).

The murder of Sharon Bushong was unquestionably senseless and horrific. However, the record is devoid of the kind of deliberation the legislature intended, and that this court has previously required, to uphold a finding of death eligibility under section 9—1(b)(11). On the record before us we must conclude that no reasonable trier of fact could have found, beyond a reasonable doubt, that the murder was committed "in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design." Accordingly, we vacate the jury's finding of death eligibility under section 9—1(b)(11).

### B. Felony Murder Aggravating Factor

Defendant challenges the jury's death penalty eligibility verdict based upon the commission of a felony murder. Defendant contends that the verdict returned by the jury was legally insufficient because it omitted the mental state necessary to support a finding of death eligibility.

The felony-murder aggravating factor is set forth in section 9—1(b)(6) of the Criminal Code of 1961. 720 ILCS 5/9—1(b)(6) (West 1994). That section provides for death eligibility where, *inter alia*, the victim was killed in the course of another felony, and where the defendant "acted with the intent to kill the murdered individual or with

the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(6)(b) (West 1994).

In the instant case, the verdict form returned by the jury omitted the required mental state. The verdict form reads: "We the jury unanimously find beyond a reasonable doubt that the defendant Bobby Williams is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that: the defendant was 18 years old or older at the time of the murder for which he was convicted in this case; and the following statutory aggravating factor exists: the murder was committed during the course of an armed robbery." Defendant claims that because the requisite mental state was omitted, the jury's verdict is legally insufficient. Therefore, according to defendant, he was not found eligible for the death penalty under section 9—1(b)(6) and his death sentence must be vacated.

Whether the felony-murder eligibility verdict returned by the jury in the case at bar is legally insufficient is governed by this court's decision in *People v. Mack*, 167 Ill. 2d 525 (1995). In *Mack*, this court held that a defendant was entitled to a new sentencing hearing because the felony-murder eligibility verdict omitted the mental state needed to support a finding of death eligibility. The verdict form in that case provided: " 'We, the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery.' " *Mack*, 167 Ill. 2d at 529-30. In analyzing the sufficiency of this verdict, this court explained:

"It is well established that a general verdict of 'guilty in manner and form as charged in the indictment' or simply 'guilty' is sufficient to sustain a conviction [citation], as is a verdict identifying the offense by name [citation]. However, where the verdict purports to set out the ele-

ments of the offense as specific findings, it must do so completely or be held insufficient. [Citation.]

*** [T]he verdict [in this case] attempted to set forth a statutory aggravating factor, but failed to do so completely and omitted an essential element." *Mack*, 167 Ill. 2d at 538.

Because the eligibility verdict omitted an essential element, this court concluded that it was legally insufficient—it did not constitute an "actual verdict"—and the defendant's death sentence could not be sustained. *Mack*, 167 Ill. 2d at 539. See also *People v. Buss*, 187 Ill. 2d 144, 223-25 (1999) (felony-murder eligibility verdict legally insufficient because it omitted the required *mens rea*); *People v. Macri*, 185 Ill. 2d 1, 58 (1998) (same); *People v. Jackson*, 182 Ill. 2d 30, 68 (1998) (same).

In the instant case, the State does not dispute the fact that defendant's felony-murder eligibility verdict is legally insufficient. The State argues, instead, that defendant is procedurally barred from challenging the sufficiency of the verdict because the issue was not properly preserved at trial. We disagree.

The court in *Mack* stressed that the issue there, like the issue in this case, involved the sufficiency of the jury's findings rather than an error in how the jury was instructed. *Mack*, 167 Ill. 2d at 536; *cf. People v. Armstrong*, 183 Ill. 2d 130, 149 (1998). This distinction was significant because, as the *Mack* opinion noted, an insufficient verdict cannot be deemed harmless error based upon the strength of the evidence. *Mack*, 167 Ill. 2d at 539, citing *Sullivan v. Louisiana*, 508 U.S. 275, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993).

In *Sullivan*, the United States Supreme Court held that harmless error analysis could not be used to cure a legally deficient verdict. In so holding, the Court explained:

"Once the proper role of an appellate court engaged in the *Chapman* [harmless error] inquiry is understood, the

illogic of harmless-error review in the present case becomes evident. Since, for the reasons described above, there has been no jury verdict within the meaning of the Sixth Amendment, the entire premise of *Chapman* review is simply absent. There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object*, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error. That is not enough." (Emphasis in original.) *Sullivan*, 508 U.S. at 280, 124 L. Ed. 2d at 189-90, 113 S. Ct. at 2082.

In the case at bar, the jury returned only a general verdict at the guilt phase of trial, and the defective death-eligibility verdict form resulted in no finding of the mental state necessary to sustain a verdict of death eligibility under section 9—1(b)(6). *Mack*, 167 Ill. 2d at 538-39. Because the jury failed to return an actual verdict of death eligibility, there is "no object *** upon which harmless-error scrutiny can operate." (Emphasis omitted.) *Sullivan*, 508 U.S. at 280, 124 L. Ed. 2d at 189-90, 113 S. Ct. at 2082. Accordingly, harmless error analysis may not be used to cure the defective death-eligibility verdict. *Cf. People v. Childress*, 158 Ill. 2d 275 (1994) (omission of mental state from felony-murder eligibility verdict not reversible error where same jury returned finding at guilt phase that defendant was guilty of knowing or intentional murder).

*Mack* also raised, though it did not decide, the issue of whether this court could, under Illinois law, cure a jury's invalid death-eligibility verdict by making an independent finding as to the existence of a statutory aggravating factor. *Mack*, 167 Ill. 2d at 534-35, citing *Clem-*

*ons v. Mississippi*, 494 U.S. 738, 108 L. Ed. 2d 725, 110 S. Ct. 1441 (1990). This court has recently answered this question in the negative:

"[T]he Illinois capital sentencing statute does not permit a court of review to usurp the jury's role as sentencer without damaging defendant's due process rights. [Citations.] The statute plainly states that, if a defendant elects to have a jury perform the sentencing function, the jury and the jury alone will determine defendant's eligibility for death and whether any mitigating factor or factors should preclude capital punishment. [Citation.] By its terms, the Illinois capital sentencing statute does not permit this court to assume these responsibilities. Defendant has a liberty interest in having a jury 'make particular findings relative to sentencing.' [Citation.]" *People v. Shaw*, 186 Ill. 2d 301, 344 (1998).

See also *People v. West*, 187 Ill. 2d 418, 445-46 (1999) (same). Thus, in the case at bar, this court may not independently make a finding that defendant is death eligible under section 9—1(b)(6) without violating the defendant's constitutionally protected liberty interest in having the jury determine death eligibility. See *Mack*, 167 Ill. 2d at 539.

We think it clear that sentencing a defendant to death when there has been no finding of death eligibility is such a fundamental defect that it amounts to plain error. This is particularly true, given that the deficiency in the eligibility finding is not amenable to resentencing or harmless error analysis by this court. We note, moreover, that *Mack* implicitly holds that the omission of the requisite mental state from the eligibility verdict under the present circumstances is plain error. *Mack* held that the insufficiency of the eligibility verdict could be raised for the first time in a post-conviction petition, under a claim of ineffective assistance of direct appellate counsel. *Mack* further held that appellate counsel in that case was constitutionally ineffective for having failed to raise the verdict issue on direct review. It would be illogical to

hold that appellate counsel in the case at bar may not raise the very claim which, in *Mack*, this court held appellate counsel should have raised on direct appeal. Accordingly, notwithstanding defendant's procedural default, we believe that we are compelled to recognize the error in the felony-murder eligibility verdict.

## C. Disposition of This Appeal

Before a defendant may be sentenced to death in Illinois, the existence of one valid, statutory aggravating factor must be proven beyond a reasonable doubt. See 720 ILCS 5/9—1(b), (f) (West 1994); *People v. West*, 187 Ill. 2d 418, 445 (1999). That has not occurred in this case. A majority of this court has determined that the jury's finding of death eligibility pursuant to the cold, calculated and premeditated aggravating factor (720 ILCS 5/9—1(b)(11) (West 1994)) cannot be affirmed, either because the evidence is insufficient to sustain the finding of death eligibility under that factor (193 Ill. 2d at 40 (opinion of McMorrow, J., joined by Miller and Freeman, JJ.)), or because the factor itself is unconstitutional (193 Ill. 2d at 61 (Heiple, J., concurring in part and dissenting in part)), or because the Illinois death penalty statute is unconstitutional (193 Ill. 2d at 58 (Harrison, C.J., concurring in part and dissenting in part)). A majority of this court has also concluded that defendant is not death eligible under the felony-murder aggravating factor (720 ILCS 5/9—1(b)(6) (West 1994)) either because the legally insufficient verdict form returned on that factor amounts to plain error (193 Ill. 2d at 44 (opinion of McMorrow, J., joined by Freeman and Rathje, JJ.)) or because the Illinois death penalty statute is unconstitutional (193 Ill. 2d at 58 (Harrison, C.J., concurring in part and dissenting in part)). Accordingly, because this court is unable to affirm either of the factors upon which defendant was found death eligible, defendant's death sentence must be vacated and the cause remanded for a new sentencing hearing.

At the remand sentencing hearing, the State may not pursue death eligibility under the cold, calculated and premeditated aggravating factor (720 ILCS 5/9—1(b)(11) (West 1994)) because, again, a majority of this court has held either that the evidence is insufficient to sustain the jury's finding of death eligibility or that the factor is unconstitutional. The former determination bars the State from pursuing death eligibility under principles of double jeopardy. See *West*, 187 Ill. 2d at 447 ("once either the trial court or court of review has determined that the evidence was insufficient to prove the existence of a statutory aggravating factor, the State is precluded by double jeopardy principles from seeking the death penalty again"). However, the State is not barred by double jeopardy principles from pursuing death eligibility under the felony-murder aggravating factor (720 ILCS 5/9—1(b)(6) (West 1994)). See *People v. Mack*, 182 Ill. 2d 377 (1998) (double jeopardy not a bar to second capital sentencing hearing where reversal of death sentence is based upon flawed verdict form).

### D. Other Errors at Sentencing

Defendant alleges other errors relating to the admission of evidence at his sentencing hearing. In light of our disposition of this appeal, we need not address these contentions at this time.

### E. Constitutionality of Death Penalty Statute

Defendant challenges the constitutionality of Illinois' death penalty on three grounds. Defendant asserts that the statute is unconstitutional because it is inevitable that an innocent person will be executed; that the statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation; and that the statute is unconstitutional because it fails to sufficiently minimize the risk that death sentences will be arbitrarily and capriciously

imposed. Each of these contentions has been rejected by this court, and we decline to revisit our holdings on these issues. See *People v. Bull*, 185 Ill. 2d 179, 211-20 (1998); *People v. Munson*, 171 Ill. 2d 158, 203-05 (1996); *People v. Taylor*, 166 Ill. 2d 414, 440 (1995).

## CONCLUSION

For the foregoing reasons, defendant's conviction is affirmed. Defendant's death sentence is vacated and the cause is remanded to the circuit court of St. Clair County for a new sentencing hearing to be conducted in accordance with the dictates of this opinion.

*Conviction affirmed;*
*death sentence vacated;*
*cause remanded.*

JUSTICE MILLER, specially concurring:

I agree with the majority that the defendant's conviction for first degree murder must be affirmed. I also agree that the defendant was not properly found eligible for the death penalty under the "cold, calculated and premeditated" aggravating circumstance found in section 9—1(b)(11) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(11) (West 1994)).

Unlike the majority, however, I do not believe that the second eligibility finding made by the sentencing jury, that involving section 9—1(b)(6) (720 ILCS 5/9—1(b)(6) (West 1994)), the commission of murder in the course of another felony, was invalid under *People v. Mack*, 167 Ill. 2d 525 (1995). Like Justices Bilandic and Heiple, I believe that the jury's determination concerning section 9—1(b)(6) may stand, even though the verdict form used in this case omitted any reference to the mental state necessary to sustain a finding under that provision, which was the defect found in *Mack*.

In the present case, the same jury had previously found the defendant guilty of first degree murder. At the

guilt phase of the proceedings, the jury was instructed on all three forms of murder: intentional murder, knowing murder, and felony murder. After deliberating, the jury returned a general verdict of guilty on the charge of first degree murder. Addressing similar issues in the capital sentencing context, our cases have consistently held that the return by a jury of a general verdict of guilty of murder, after being instructed on the multiple forms of the offense, gives rise to the presumption that the jury found the defendant guilty of intentional murder. Under that principle, a jury's implicit finding of intent or knowledge at the guilt stage of the proceedings may satisfy the subsequent requirement of a finding of intent or knowledge for purposes of establishing a defendant's eligibility for the death penalty, whether under section 9—1(b)(6), murder in the course of another felony, as in this case, or under section 9—1(b)(3), multiple murders (720 ILCS 5/9—1(b)(3), (b)(6) (West 1998)). See *People v. Armstrong*, 183 Ill. 2d 130, 149-52 (1998) (jury trial, jury sentencing; section 9—1(b)(6)); *People v. Smith*, 176 Ill. 2d 217, 228-30 (1997) (jury trial, bench sentencing; section 9—1(b)(6)); *People v. Shatner*, 174 Ill. 2d 133, 149-51 (1996) (jury trial, bench sentencing; section 9—1(b)(6)); *People v. Johnson*, 149 Ill. 2d 118, 156-57 (1992) (jury trial, bench sentencing; section 9—1(b)(6)); *People v. Thompkins*, 121 Ill. 2d 401, 455-56 (1988) (jury trial, bench sentencing; section 9—1(b)(3)). Thus, while I continue to believe that *Mack* was wrongly decided, I would find it distinguishable here. Unlike the present case, *Mack* involved a bench trial and a jury sentencing hearing, and the eligibility stage marked the first opportunity for the jury to make any findings of intent.

Applying the preceding rules to the present case, we may conclude that the jury found the defendant guilty of intentional murder, and we may use the determination of intent implicit in that verdict to supply the finding

needed to establish the defendant's eligibility for the death penalty under section 9—1(b)(6). The *mittimus* entered by the trial judge properly cites section 9—1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9—1(a)(1) (West 1994)), intentional murder, as the statutory basis for the defendant's conviction. We should do likewise and recognize the finding of intent implicit in the jury's verdict. That much should be sufficient to satisfy the requirements of *Mack*, and, like Justices Bilandic and Heiple, I would therefore uphold the jury's determination of eligibility under the murder-in-course-of-felony aggravating circumstance.

Because a majority of this court has not affirmed either of the two statutory aggravating circumstances on which the defendant's eligibility for the death penalty was premised, I agree that the defendant's death sentence must be vacated and that the cause must be remanded for a new sentencing hearing.

JUSTICE BILANDIC, also specially concurring:

I join in part I of the opinion, which correctly affirms defendant's convictions. I also join in part II(C), which recognizes that defendant's death sentence must be vacated because a majority of this court has not affirmed either one of the two eligibility factors upon which it was based. I also join in parts II(D) and II(E). I, however, do not join in parts II(A) and II(B) of the opinion, for the reasons explained below.

Cold, Calculated and Premeditated Aggravating Factor

The jury found defendant eligible for the death penalty under section 9—1(b)(11) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(11) (West 1994)). According to part II(A) of the opinion, the evidence on this factor was insufficient to support the jury's finding. I disagree. I would affirm the jury's finding of death eligibility on this factor for the reasons stated in the separate opinion of Justice Rathje.

### Felony Murder Aggravating Factor

The jury also found defendant eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(6) (West 1994)). According to part II(B) of the opinion, this finding must be vacated pursuant to *People v. Mack*, 167 Ill. 2d 525 (1995). I disagree. I would affirm the jury's finding of death eligibility on this factor. *Mack* is distinguishable from this case and, thus, it provides no basis for vacating defendant's death sentence.

The defendant in *Mack* was found guilty of murder and armed robbery at a bench trial. A jury was empaneled for the death penalty hearing. The jury was properly instructed to determine whether the defendant was eligible for the death penalty solely on the basis of the statutory aggravating factor of murder in the course of another felony (see Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)). The jury returned a verdict finding the defendant eligible for the death penalty. The eligibility verdict form read: " 'We, the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery.' " *Mack*, 167 Ill. 2d at 529-30. The defendant alleged in his postconviction petition that appellate counsel was ineffective for not raising on direct appeal that the death-eligibility verdict was legally insufficient. The defendant argued that the jury failed to find that the statutory aggravating factor was proven given that the eligibility verdict form omitted the culpable mental state required to establish murder in the course of a felony. The trial court found appellate counsel ineffective and vacated the defendant's death sentence.

A majority of this court affirmed and held that appellate counsel was ineffective for failure to seek reversal of the defendant's death sentence on the basis of the defective eligibility verdict. *Mack*, 167 Ill. 2d at 533-38. In so

holding, we found appellate counsel's performance to be deficient for failing to recognize the fundamental importance of a legally sufficient eligibility verdict, which must include a finding on all essential elements of the statutory aggravating factor at issue. *Mack*, 167 Ill. 2d at 533. In support, we pointed out that a culpable mental state of intent to kill or knowledge of a strong probability of death or great bodily harm is an essential element of the particular statutory aggravating factor upon which the defendant's eligibility for the death penalty was based, namely, murder in the course of a felony. *Mack*, 167 Ill. 2d at 533. Next, we found that, had appellate counsel raised the issue of the defective eligibility verdict, there is a reasonable probability that the defendant's death sentence would have been reversed. *Mack*, 167 Ill. 2d at 533-38. We based this finding on a determination that the meaning of the jury's eligibility verdict could not be determined clearly and without speculation from the record, which included a discrepancy between the jury instructions and the verdict form at the eligibility phase. *Mack*, 167 Ill. 2d at 535-37. This court therefore concluded that appellate counsel was ineffective for failing to raise on direct appeal the issue that the death eligibility verdict was legally insufficient because the jury had not found the mental state necessary for finding the defendant eligible for the death penalty. *Mack*, 167 Ill. 2d at 538.

Here, at first glance, the circumstances surrounding defendant's death-eligibility verdict appear to mirror those found problematic in *Mack*. As in *Mack*, the State here relied on the section 9—1(b)(6) statutory aggravating factor of murder in the course of a felony to establish defendant's eligibility for the death penalty. To be eligible for the death penalty under section 9—1(b)(6), a defendant must have ''acted with the intent to kill the murdered individual or with the knowledge that his acts

created a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(6) (West 1994). Likewise, the jury in this case was also properly instructed as to the grounds for finding defendant eligible for the death penalty under section 9—1(b)(6), including the aforementioned mental states. The verdict returned by the jury as to defendant's eligibility for the death penalty stated:

"We, the jury, unanimously find beyond a reasonable doubt that the defendant, Bobby Williams, is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

the defendant was 18 years old or older at the time of the murder for which he was convicted in this case; and

the following statutory aggravating factor exists: the murder was committed during the course of an armed robbery."

Although this death-eligibility verdict form is similar to the death-eligibility verdict form found deficient in *Mack*, there are significant differences in the circumstances surrounding the respective jury verdict forms. As noted, in *Mack*, the defendant was found guilty at a bench trial but was found eligible for the death penalty by a jury. Consequently, the sentencing jury in *Mack* had not made a determination at the guilt phase of the trial regarding the defendant's mental state while committing the murder. Thus, the jury's decision as to whether the State proved the defendant's mental state for purposes of finding the defendant eligible for the death penalty under the murder in the course of a felony aggravating factor could not be ascertained from the record. See *Mack*, 167 Ill. 2d at 537 (explaining that all parts of the record will be searched and interpreted together in determining the meaning of a verdict).

In the case at bar, however, the same jury that found defendant eligible for the death penalty had previously found defendant guilty of the murder of Sharon Bushong. The record reveals that, at the guilt phase of

defendant's trial, the jury was presented with evidence that defendant was caught on videotape deliberately shooting the compliant store clerk in the head after she opened the cash register drawer for him. The jury was also instructed properly on intentional, knowing and felony murder, and returned a general verdict finding defendant guilty of the offense of first degree murder. Under these circumstances, we have held that such a general verdict raises the presumption that the jury found that defendant committed the most serious crime alleged, here that being intentional murder. For example, in *People v. Armstrong*, 183 Ill. 2d 130, 151-52 (1998), we held that there was no plain error where the sentencing jury returned a general verdict of death eligibility but had not been instructed at the eligibility stage of the sentencing hearing as to the culpable mental state requirement under the felony-murder provision in section 9—1(b)(6). We reasoned in *Armstrong* that the same jury at the guilt phase of the trial, after being properly instructed on the issue of the defendant's intent, had returned a general verdict finding defendant guilty of murder, which raised the presumption that the jury had found the defendant committed the most serious crime alleged, namely, intentional murder. See also *People v. Cardona*, 158 Ill. 2d 403, 411 (1994) (holding that where an indictment contains several counts arising out of a single transaction and a general verdict is returned, the effect is that the defendant is guilty as charged in each count to which the proof is applicable); *People v. Johnson*, 149 Ill. 2d 118, 157 (1992) (holding that where the jury was charged with instructions including intentional murder and a general verdict was returned, these circumstances raise the presumption that the jury found the defendant guilty of intentional murder).

Accordingly, in this case, the jury did make a mental state finding at the guilt phase of the trial and determined

that the State had proved defendant intended to kill Bushong. Moreover, at the eligibility phase, the same jury considered its prior guilty verdict and the evidence from the guilt phase of the trial, and the trial judge properly instructed the jury as to the culpable mental state required under section 9—1(b)(6). These factors support the conclusion that the jury found that defendant acted with the culpable mental state necessary to establish defendant's death-penalty eligibility. See *People v. Shatner*, 174 Ill. 2d 133, 150-51 (1996) (upholding trial judge's death-eligibility finding based on the aggravating factor of murder in the course of a felony because the trial judge took judicial notice of the jury's general verdict at the guilt phase of the trial which encompassed the finding of intent necessary for determining eligibility).

Unlike in *Mack*, the meaning of the eligibility verdict and the intention of the jury is clear, and requires no speculation on the part of this court. Therefore, there has been a valid death-eligibility finding by the sentencing jury, and the circuit court's reliance on *Mack* is misplaced. *Cf. People v. Buss*, 187 Ill. 2d 144, 222-27 (1999) (holding that one of the jury's eligibility verdicts properly established the defendant's eligibility for the death penalty notwithstanding that the jury's other eligibility verdict, which was based on murder in the course of a felony, was legally insufficient under *Mack* because the verdict form omitted the necessary mental state; but where this court did not consider that the same jury found the requisite mental state at the guilt phase of the trial after finding the defendant guilty of six counts of first degree murder, including intentional murder); *People v. Jackson*, 182 Ill. 2d 30, 66-69 (1998) (same).

In conclusion, I would hold that the jury's eligibility verdict was sufficient to affirm defendant's eligibility for the death penalty under section 9—1(b)(6).

### Disposition of This Appeal

As stated above, I would affirm the jury's finding that defendant is eligible for the death penalty under both sections 9—1(b)(11) and 9—1(b)(6). Nonetheless, I agree that, because a majority of this court has not affirmed either one of the two eligibility factors upon which defendant's death sentence was based, that sentence must be vacated. I therefore join in part II(C) of the opinion, which explains the disposition of this appeal.

JUSTICE RATHJE, also specially concurring:

Unlike Justices McMorrow, Miller and Freeman, I would hold that the evidence was sufficient to find defendant eligible for the death penalty under section 9—1(b)(11) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(11) (West 1994)). Accordingly, I respectfully dissent.

Section 9—1(b)(11) provides for death penalty eligibility where the defendant was 18 years or older at the time of the offense and where:

"[T]he murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9—1(b)(11) (West 1994).

Defendant argues that the evidence produced at trial was insufficient to prove, beyond a reasonable doubt, that he was eligible for the death penalty under section 9—1(b)(11). Specifically, defendant argues that the State failed to prove that defendant murdered Bushong according to a "preconceived plan, scheme or design" (720 ILCS 5/9—1(b)(11) (West 1994)).

In response, the State argues that two facts establish that the murder was committed pursuant to a preconceived plan. First, the time display on the surveillance videotape shows that just under one minute elapsed from the time the two assailants entered the store until the time they left. According to the State, the fact that the

murder occurred quickly indicates that it was planned in advance. Second, Bushong did not physically resist defendant during the robbery. This fact is significant, in the State's view, because "unless defendant had planned to kill [Bushong] all along, [there was no point in] deliberately shooting her after she had complied with his demands and stood to the side unthreateningly." Thus, according to the State, both the speed of the murder and Bushong's cooperation in opening the cash register are sufficient to support the jury's finding that the murder was committed pursuant to a preconceived plan, scheme or design.

I agree with the State. The standard of review is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements necessary to establish defendant's eligibility for the death penalty beyond a reasonable doubt. *People v. Pasch*, 152 Ill. 2d 133, 213-14 (1992). Here, the speed of the murder and the victim's cooperation undeniably permit a reasonable trier of fact to conclude, beyond a reasonable doubt, that the murder was committed pursuant to a preconceived plan. The surveillance videotape reveals that defendant shot Bushong in the head at the very instant that the cash register drawer opened. In addition, although the State does not mention it, the reaction of defendant's accomplice is significant. Defendant's accomplice, who was standing only feet away from a brutal murder, merely glanced in defendant's direction when the gun was fired and immediately returned to stealing potato chips. Nothing in the accomplice's reaction shows any sign of surprise, fear, or panic; he neither ran from the store nor even looked over the counter to find out what defendant had done. The accomplice simply continued stealing potato chips as if nothing unexpected had happened.

To be sure, other circumstances surrounding the murder, such as the fact that it occurred in the front of

the store in full view of the security cameras, might allow a reasonable fact finder to conclude that Bushong's murder was unplanned. *Cf. Munson*, 171 Ill. 2d at 192 (finding of preconceived plan upheld, in part, because the defendant drove the murder victim to an isolated area so that the killing would not be observed). Nevertheless, the surveillance videotape provides more than sufficient evidence for a reasonable trier of fact to conclude, beyond a reasonable doubt, that the murder was committed pursuant to a preconceived plan, scheme or design.

\* \* \*

Notwithstanding the foregoing analysis, I agree with Justices McMorrow, Miller, Bilandic and Freeman that, under the particular circumstances presented by this case, defendant's death sentence must be vacated. Although a majority of this court believes that defendant's death sentence should be affirmed, that majority does not agree on a single basis for doing so. I, along with Justice Bilandic, would hold that defendant was properly found eligible for the death penalty under section 9—1(b)(11). In addition, Justices Miller, Bilandic, and Heiple would hold that defendant was properly found eligible for the death penalty under the felony-murder aggravating factor (720 ILCS 5/9—1(b)(6) (West 1994)). Whether this court is *permitted* to affirm the death sentence in this case is uncertain. However, even if permitted, affirming a death sentence where a majority of this court cannot agree on the reason for doing so is not *required* and certainly imprudent. Accordingly, I agree that defendant's death sentence must be vacated.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Williams' murder conviction should not be disturbed, but that his sentence of death should be set aside. In my view, however, the State should not be

permitted to seek the death penalty under any theory at the new sentencing hearing. For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), this state's present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). It is therefore void and unenforceable. Accordingly, on resentencing, the circuit court should impose a term of imprisonment. 720 ILCS 5/9—1(j) (West 1998).

JUSTICE HEIPLE, also concurring in part and dissenting in part:

I concur in the majority's affirmance of defendant's conviction for first degree murder. However, because I would also affirm defendant's sentence of death, I dissent in part.

On November 3, 1994, Sharon Bushong was murdered during the course of a robbery at the convenience store where she worked. Following investigation by police, defendant was arrested and charged with the crime. After hearing the evidence and arguments, the jury returned a general verdict finding defendant guilty of first degree murder.

During the sentencing phase of defendant's trial, the same jury found the defendant eligible for the death penalty based upon two statutory aggravating factors: (1) murder committed in a cold, calculated manner pursuant to a preconceived plan, scheme or design to take a human life (720 ILCS 5/9—1(b)(11) (West 1994)); and (2) murder committed in the course of another felony (720 ILCS 5/9—1(b)(6) (West 1994)). With respect to the first factor, defendant argues, *inter alia*, that his sentence of death must be vacated because the statute in question is unconstitutionally vague. With respect to the second factor, defendant argues that the verdict form signed by the

jury was defective in that it failed to list the mental state required by the statute, namely, that defendant intended to kill the victim. Although I agree with defendant that the "preconceived plan" aggravating factor is insufficiently precise to genuinely narrow the class of persons eligible for the death penalty, I would hold that defendant was properly sentenced to death under the "felony-murder" factor.

Defendant argues that section 9—1(b)(11), which makes a defendant eligible for the death penalty upon a finding that "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life," does little more than describe the *mens rea* of any intentional murder. 720 ILCS 5/9—1(b)(11) (West 1994). In support of this contention, defendant cites this court's opinion in *People v. Stewart*, 105 Ill. 2d 22 (1984). In *Stewart*, this court approved a definition of premeditation as " '[a] prior determination to do an act,' " but noted that " 'such determination need not exist for any particular period before it is carried into effect.' " *Stewart*, 105 Ill. 2d at 73. According to defendant, therefore, the statutory term "premeditated" as used in section 9—1(b)(11) is triggered in *any* case in which a defendant is convicted of first degree intentional murder. Likewise, the terms "cold" and "calculated" fail to meaningfully differentiate among first degree intentional murders. Accordingly, defendant argues that section 9—1(b)(11) fails to satisfy the constitutional requirement that a death-eligibility factor must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742 (1983). I agree.

In the past, this court has rejected constitutional

challenges to section 9—1(b)(11), holding that the statutory language "pursuant to a preconceived plan, scheme or design to take a human life" provided sufficient guidelines for the sentencer in determining eligibility. See, *e.g.*, *People v. Johnson*, 154 Ill. 2d 356, 372-73 (1993); *People v. Munson*, 171 Ill. 2d 158, 191 (1996); *People v. Macri*, 185 Ill. 2d 1, 52-53 (1998); *People v. Haynes*, 174 Ill. 2d 204, 254-55 (1996); *People v. Williams*, 173 Ill. 2d 48, 89-90 (1996). In those cases, this court held that the requirement that the sentencer find that defendant acted pursuant to a preconceived plan required a finding of more than the simple intent to commit a murder. As such, we held that this factor was not present in every murder, and that section 9—1(b)(11) placed the necessary restraint on the sentencer's discretion to impose death. Nevertheless, despite this court's holdings in those cases, I do not believe that section 9—1(b)(11) provides a constitutionally adequate means of identifying those individuals deserving of the death penalty.

The instant case aptly illustrates the degree of imprecision inherent in section 9—1(b)(11). Today, three justices of this court, including myself, find the evidence in this case sufficient to permit a jury to find, beyond a reasonable doubt, that defendant killed the victim pursuant to a preconceived plan to take a human life. In so finding, we base our conclusion upon the fact that defendant killed the victim almost immediately after she had cooperated by opening the cash register. However, while I believe that this evidence was indeed sufficient for a jury to find the existence of a preconceived plan to take a human life, it is difficult to imagine a case of intentional murder in which the evidence would not be sufficient for such a finding. As this court held in *Stewart*, premeditation does not require that a defendant's intent exist for any particular period of time before he acts. *Stewart*, 105 Ill. 2d at 73. Accordingly, there is nothing in section

9—1(b)(11) which would prevent a sentencer from finding that premeditation existed in the instant before defendant pulled the trigger. Indeed, if premeditation did not in fact exist to some extent, it might be argued that the killing was accidental or inadvertent. I fail to see how the phrase "preconceived plan, scheme or design" provides any greater limitation upon a sentencer's discretion. As Justice McMorrow points out in her plurality opinion, this court has never explicitly stated what is meant by that phrase. 193 Ill. 2d at 31. That we have failed to do so should not be surprising, however, as the phrase defies explicit definition. It is unclear from the language of the statute whether a defendant must have harbored the plan to kill for a second, a minute, an hour, or some other undefined period. Where the language of the statute is so vague that this court is incapable of formulating a standard for its application, such a statute necessarily provides insufficient guidance to a sentencer charged with determining whether a defendant is eligible to be put to death. Accordingly, I would hold that section 9—1(b)(11) is unconstitutional.

Despite my belief that defendant was improperly sentenced to death under section 9—1(b)(11), I nevertheless believe that defendant's sentence should be affirmed based upon the jury's finding that defendant was eligible for the death penalty by virtue of having committed the murder during the course of another felony. Section 9—1(b)(6) of the Criminal Code makes a defendant eligible for the death penalty where:

"[T]he murdered individual was killed in the course of another felony if:
(a) the murdered individual:
(i) was actually killed by the defendant ***
***
[and]
(b) in performing the acts which caused the death of the murdered individual *** the defendant acted with

the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another[.]" 720 ILCS 5/9—1(b)(6) (West 1994).

When returning its verdict, however, the jury signed a verdict form which stated:

"We, the jury, unanimously find beyond a reasonable doubt that the defendant, Bobby Williams, is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

the defendant was 18 years old or older at the time of the murder for which he was convicted in this case; and

the following statutory aggravating factor exists: the murder was committed during the course of an armed robbery."

Defendant points out that, although the verdict signed by the jury listed some of the elements which the jury was required to find in order to find the defendant eligible for death under section 9—1(b)(6), the form failed to list the requirement that the jury find that the defendant acted with an intent to kill or with knowledge that his acts created a strong probability of death or great bodily harm. Citing this court's opinion in *People v. Mack*, 167 Ill. 2d 525 (1995), defendant argues that the verdict form's omission of the requisite mental state rendered the jury's verdict legally insufficient to find him eligible for the death penalty.

For the reasons which led me to dissent in *Mack*, I disagree with defendant in this case. *Mack*, 167 Ill. 2d at 539-41 (Bilandic, J., dissenting, joined by Miller and Heiple, JJ.). When the complete record of the defendant's sentencing hearing is reviewed, it is clear that the jury's eligibility verdict was proper. The record clearly demonstrates that the jury was instructed that eligibility premised upon murder in the course of a felony required a finding that "[t]he murdered person was actually killed by the defendant and in performing the acts which caused the death of the murdered person, the defendant

acted with the intent to kill the murdered person or with knowledge that his acts created a strong probability of death or great bodily harm to the murdered person." This instruction was clear and precise. Moreover, the evidence that defendant intended to kill the victim when he raised his gun to the victim's head and shot her is overwhelming. Under the facts of this case, I would hold that the error, if any, stemming from the verdict form's failure to list the requisite mental state with which defendant acted was harmless beyond a reasonable doubt. Accordingly, I would affirm the jury's verdict sentencing defendant to death based upon his commission of a murder in the course of another felony.

I therefore concur in part and dissent in part.