No. 2--03--0446                                    filed: 8/1/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 98--CF--110 |
| BERNINA MATA, | ) ) ) | Honorable Gerald F. Grubb, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

Following a jury trial, the defendant, Bernina Mata, was convicted of first degree murder (720 ILCS 5/9--1(a)(2) (West 1998)). The same jury found the defendant eligible for the death penalty pursuant to section 9--1(b)(11) of the Criminal Code of 1961 (the Criminal Code) (720 ILCS 5/9--1(b)(11) (West 1998)) and determined that there were no mitigating factors sufficient to preclude the imposition of that sentence. Subsequently, the trial court sentenced the defendant to death. The defendant directly appealed to the Illinois Supreme Court, raising nine contentions. On January 11, 2003, former Governor George Ryan commuted the defendant's death sentence to a term of natural life imprisonment without the possibility of parole.

Upon her appeal being transferred to this court, the defendant filed a motion requesting to withdraw eight of her contentions. We granted this motion. The defendant's

sole remaining contention was that she was entitled to a new sentencing hearing because the State failed to prove beyond a reasonable doubt that she was eligible for the death penalty in that she committed murder in a cold, calculated, and premeditated manner. In light of the fact that the defendant's death sentence had been commuted, we dismissed the defendant's appeal as moot. See People v. Mata, 353 Ill. App. 3d 784 (2004).

On December 15, 2005, the Illinois Supreme Court reversed the judgment of this court, reasoning that the defendant's contention did not concern her sentence. See People v. Mata, 217 Ill. 2d 535 (2005). Rather, pursuant to Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the defendant's contention concerned the sufficiency of proof on a "functional equivalent" of an element of the offense of which she was convicted. The supreme court remanded the cause with the direction that we consider the merits of the defendant's contention. See Mata, 217 Ill. 2d at 551-52.

Upon remand to this court, the defendant requested leave to file a supplemental brief raising the additional argument that due to several errors of constitutional magnitude, she was denied a fair sentencing hearing. We granted the defendant's motion. We now address the merits of the defendant's two contentions on appeal: (1) whether the defendant was proved eligible for the death penalty beyond a reasonable doubt and (2) whether the defendant was denied a fair sentencing hearing due to inadequate jury instructions and misleading arguments by the State.

BACKGROUND

The facts relevant to this appeal are as follows. Following a jury trial in October 1999, the defendant was convicted of first degree murder (720 ILCS 9--1(a)(2) (West 1998)), in connection with the stabbing death of John Draheim. At the trial, Russell

Grundmeier testified that in June 1998, the defendant was his roommate.  At that time, Russell was in love with the defendant and believed that the defendant was in love with him.  Russell and the defendant had a sexual relationship.  However, the defendant had informed Russell that she was a lesbian, and the two of them had an understanding that the defendant could have sex with women.

On the evening of June 27, 1998, Russell and the defendant went to Sporty's bar in Belvidere to celebrate Russell's birthday.  Around 7 p.m., Russell dropped off the defendant at the bar and then left to pick up some Listerine for the defendant's newly-pierced tongue, which needed to be rinsed every hour.  Russell returned to the bar around 7:15 p.m. and found the defendant sitting with a man she introduced as John.

Russell remained at the bar until 10 p.m.  While he was there, the defendant was drinking heavily, flirting, and walking around.  Before he left the bar, the defendant walked over to Russell and whispered to him that she was going to kill John and that he was going to help.  The defendant's tone of voice was angry.  Russell responded that he was not going to help.  The defendant sat down next to John, and Russell left the bar soon after.

Russell arrived home around 10:15 p.m.  The defendant arrived home 15 to 20 minutes later, with James Clark, a neighbor of theirs, and John.  The four of them talked and, with the exception of James, drank alcohol.  James left after about 20 minutes.  The defendant and John sat on the couch and  flirted with each other.  Russell got mad and went outside because he thought that he was supposed to be the only guy the defendant was with.  When Russell eventually went back inside, he heard moaning coming from the defendant's bedroom.

Russell went into the defendant's room.  The defendant and John were having what appeared to be consensual sex.  Russell grabbed John by the arm and pulled him off of the defendant.  The two men struggled and the defendant slipped off the bed and out of sight.  Russell, who weighed around 300 pounds, was able to get control of John, who weighed only about 180 pounds.  As Russell was holding John, the defendant appeared with a knife and stabbed John in the chest several times.  Russell was shocked and sickened.  However, he eventually helped the defendant dispose of John's body and clean up her bloodstained bedroom.

Detective Kurt Ditzler of the Winnebago County sheriff's police[1] testified that he interviewed the defendant regarding John's disappearance.  During the first interview, the defendant stated that on June 27, 1998, she was at Sporty's bar for her roommate Russell's birthday.  She struck up a conversation at the bar with a man named John, whom she had seen in the bar on prior occasions.  The defendant stated that John had given her a ride home and ended up coming inside.  John left at approximately 11:30 p.m.  During the second interview, the defendant admitted that she had stabbed John in her apartment on June 27.  The defendant claimed that she did so because John was trying to rape her.  During a third interview, the defendant admitted that John had not tried to rape her.  The defendant maintained that she and John never had sex.

Deputy Daniel Liston of the Winnebago County sheriff's police testified that he searched the defendant's room, pursuant to her consent.  Deputy Liston found stains that

---

[1] The Winnebago County sheriff's police joined the investigation because the victim's body was found in Winnebago County.

appeared to be blood on the bedroom closet doors, two pillow cases, and two towels. The stains tested positive for blood. Deputy Liston also testified that a decomposed body, later determined through dental records to be John, was found on July 13, 1998, in a secluded wooded area in Winnebago County.

Inspector Dexter Bartlett, a crime scene investigator with the Illinois State Police, was qualified as an expert in bloodstain analysis. Inspector Bartlett testified that he assisted in the investigation of the scene of the stabbing. Inspector Bartlett testified that there were six bloodstains on the closet doors he examined. Inspector Bartlett opined that based on the cast-off patterns of the blood spatters, the victim had been stabbed a minimum of six times. According to Inspector Bartlett, Russell's version of the events was consistent with the blood spatters found.

Dr. Larry Blum, a forensic pathologist engaged in private practice, testified that he performed an autopsy on John. Dr. Blum testified that a stab wound to the chest caused John's death. John suffered a minimum of three stab wounds, all of which penetrated the heart. Because the body was badly deteriorated, Dr. Blum could not determine the maximum number of stab wounds John could have suffered.

Henrietta Glover testified that on July 14, 1998, she was in the Boone County jail, having been arrested for forgery. Glover asked the defendant if she was really in for murder. The defendant pulled out her papers and stated, "Yeah, I killed that motherfucker." The defendant appeared happy. The defendant stated that she killed the victim because he had made her angry. The victim had touched the defendant on her shoulder and she told him to get his hands off of her or she would "snap his neck." The victim then touched her on the thigh. The defendant stated that she invited the victim to her house so she could

kill him.  The defendant led the victim to believe that they would have sex.  The defendant stated that she stabbed the victim seven or eight times.  The defendant became excited and exclaimed, "You should have saw the blood, it was cool.  It shot out thick as your thumb."  The defendant also stated that she would be on her way to Florida if Russell had not "ratted" her out.  The defendant was angry at Russell for "ratting" on her, and more than 10 times she threatened to kill him.        Olicia Taylor testified that on July 14, 1998, she was in the Boone County jail on charges of forgery.  Taylor asked the defendant what she was in for and the defendant replied that she was in for murder.  The defendant told Taylor she had killed a man in a bar who had asked her out on a date.  The defendant explained that she became angry when the man touched her, because she is a lesbian.  The defendant stated that she asked the man home, intending to kill him.

Angela Wright testified that on July 15, 1998, she was detained in the Boone County jail.  The defendant confessed to Wright that she had stabbed a man.  The defendant told Wright that after the man had touched her for a second time she decided to "teach him a lesson."  The defendant denied ever having sex with the victim and claimed never to have had sex with a man.  The defendant told Wright that she hated men.

Detective Daniel Smaha of the Belvidere police department testified that he obtained an order  permitting him to use an eavesdropping device on Glover for the purpose of obtaining further information from the defendant.  Several statements were elicited from the defendant, including (1)  "the rush from killing somebody is a much more better rush than a fucking fantastic orgasm"; (2) "if they do some more checking, if they really want to check it out, they will find out it is premeditated, and that's worse"; and (3) "I had an alibi that was so fucking airtight that I had them believing it."       Dr. David Levine, a licensed psychiatrist,

testified on behalf of the defendant.   Dr. Levine first had contact with the defendant on December 5, 1997, at the Janet Wattles Community Mental Health Center.  The defendant reported having been sexually abused as a child by her stepfather and having a history of alcohol, marijuana, and cocaine use.   The defendant also talked about having hallucinations.  The defendant told Levine that sometimes when she hallucinated she would hear the voice of her grandfather, who was important in her life.  Dr. Levine diagnosed the defendant with chronic depression and substance abuse by history.  Dr. Levine prescribed Wellbutrin for the defendant.

Dr. Levine saw the defendant again on December 19, 1997.  He believed that the defendant was not responding to her medication, although she was not suffering from hallucinations at that time.   Dr. Levine next saw the defendant on January 30, 1998, and he believed that the defendant was improving.   The defendant reported having no hallucinations.  Dr. Levine saw the defendant on April 22, 1998, and the defendant was guarded and less open.  The defendant reported that she had gotten angry at someone while at work at Sam's Club in the auto department and had thrown a tire in that person's direction.   On May 22, 1998, Dr. Levine saw the defendant, and she appeared well.  However, the defendant's roommate had called the defendant's case manager and reported that the defendant had not been taking her medicine and was becoming difficult to live with.  Dr.  Levine explained to the defendant why taking her medicine was important.  May 22 was the last time Dr. Levine saw the defendant before the June 27 incident.

Dr. Levine testified that he never knew the defendant to be violent or aggressive, although when she was not feeling well she was guarded and mistrustful.  Alcohol could

have an adverse effect on someone with the defendant's mental state. Dr. Levine did not have an opinion as to whether the defendant was sane at the time of her offense.

Cynthia Lloyd testified that she met the defendant in May 1998. They became intimately involved in June 1998. Cynthia and the defendant would occasionally kiss or hold hands in front of Russell. Russell was never very friendly to Cynthia.

The morning of June 27, 1998, the defendant was at Cynthia's house in Ingleside, Illinois. As far as Cynthia was aware, the defendant was not taking her medication and had not drunk any alcohol. The defendant left Cynthia's house and went home sometime during the day. Cynthia talked to the defendant briefly around 7:30 p.m. that evening, after the defendant had her tongue pierced. Cynthia talked to the defendant again at 11 p.m. that evening.

During the 11 p.m. call, the defendant was screaming and crying. The defendant told Cynthia that a man had tried to rape her and that there was a dead man in her bedroom. The defendant told Cynthia that she could not talk and to call back at 1:30 a.m. Cynthia called the defendant back around 11:30 p.m. and Russell answered the phone. Cynthia spoke briefly with Russell, during which time she could hear the defendant crying in the background. On June 28, 1998, the defendant went to stay with Cynthia and remained there until she was arrested.

Dr. Frank Cushing, a licensed psychologist, testified that he evaluated the defendant as to her mental state at the time of the crime and her competency to stand trial. Dr. Cushing met with the defendant in the Boone County jail five times between November 6, 1998, and March 19, 1999. According to Dr. Cushing, the defendant suffered from severe chronic post-traumatic stress disorder, stemming from being sexually abused as a child by

her stepfather. Dr. Cushing testified that besides the sexual abuse of the defendant by her stepfather, the defendant's mother indicated to him that the defendant's father may have also sexually abused her and the defendant's father may have allowed his friends to abuse her. The defendant was in remission from alcohol and substance abuse and was being treated with psychotropic medicine.

During the evaluations, the defendant related to Dr. Cushing that on the night of the stabbing, she saw her stepfather's face on John's body. Dr. Cushing explained that flashbacks such as those the defendant reported experiencing are usually caused by stimuli that recall the original trauma. The defendant reportedly never received any care for her rape trauma. Dr. Cushing and seven other mental health professionals have diagnosed the defendant with borderline personality disorder. Dr. Cushing opined that the defendant's significant mental illness interfered with her ability to think through all of the ramifications and consequences of her actions. Dr. Cushing did not believe that the defendant would have been able to premeditate this crime. Dr. Cushing believed, however, that the defendant was sane on June 27, 1998, and that she was able to appreciate the criminality of her actions.

David Wheeler, a case manager with the Illinois Department of Children and Family Services (DCFS), testified that a case was opened for the defendant in 1974 when she was sexually abused by her mother's boyfriend. The defendant was placed in foster care but then sent home after four or five months when it was determined that the abuser was no longer in the mother's home. Wheeler had contact with the defendant again in 1983 after the defendant had developed a poor relationship with her mother, who felt she had no

control over the defendant.  DCFS took custody of the defendant, and she remained in foster care and other residential placement for the next five years.

Dr. Edward Mahoney, a psychologist retained by the State, testified in rebuttal that he interviewed the defendant four times between March 30, 1999, and May 28, 1999.  Dr. Mahoney believed that the defendant was sane on June 27, 1998.  Dr. Mahoney explained that at the time of the offense, the defendant knew the wrongfulness of her acts and was able to conform her behavior to the requirements of the law.  In Dr. Mahoney's opinion, the defendant was able to premeditate the crime.  Dr. Mahoney opined that the defendant suffered from depression, borderline personality disorder, and antisocial personality disorder.  Dr. Mahoney did not believe that the defendant suffered from post-traumatic stress disorder, although he acknowledged that many of the symptoms were present.  Dr. Mahoney opined that the defendant's IQ is in the low average range.

Following the above testimony, the jury found the defendant guilty of first degree murder.  Subsequently, the case proceeded to a two-part death penalty hearing.  During the eligibility phase of the death penalty hearing, neither party offered any additional evidence.  The State argued that the defendant committed the murder in a cold, calculated, and premeditated manner pursuant to a preconceived plan.  The State argued that the testimony of Russell, Glover, Taylor, and Wright  established that the defendant planned the murder two to three hours in advance.  The defense argued that the stabbing was the result of a passionate, angry fight and that the murder was not cold, calculated, or premeditated.  The defense further argued that all three individuals were drunk and out of control on the night of the incident.  In rebuttal, the State argued that there was no "magical meaning" to the terms "premeditated" and "preconceived plan."  The State further argued,

"A preconceived plan can occur ten seconds before the act actually occurs. Preconceived actually means that you came up with that plan before you committed the act. *** Premeditation is simply making up your mind what you will do ahead of time."

The jury was instructed pursuant to Illinois Pattern Jury Instructions, Criminal, No. 7B.07 (4th ed. 2000) as follows:

"Before the defendant may be found eligible for a death sentence under the law the State must prove the following propositions:

First proposition: That the defendant was 18 years old or older at the time of the commission of the murder of which she was found guilty at the trial of this case; and

Second proposition: That the following statutory aggravating factor exists;

The murder was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom.

If you find from your consideration of all of the evidence that the first and second propositions have been proved beyond a reasonable doubt, then the defendant is eligible for a death sentence.

If you cannot unanimously find that both the first and second propositions have been proved beyond a reasonable doubt, then the defendant is not eligible for a death sentence."

After deliberating for an hour, the jury found the defendant eligible for the death penalty pursuant to section 9--1(b)(11) of the Criminal Code.

At the sentencing phase of the death penalty hearing, the State offered aggravating evidence as to the defendant's lack of remorse, a threatening letter the defendant had sent to Russell, and the victim impact testimony of John's sister. The defendant offered mitigating evidence as to the defendant's mental illness, her history of sexual abuse, her lack of significant criminal history, and her feelings of remorse. After deliberating for five hours, the jury informed the trial court that it was deadlocked as to whether to impose the death penalty. Over the objection of the defense, the trial court informed the jury that it needed to reach a unanimous verdict in that "in order to return a verdict, all jurors must agree to it." After eight more hours of deliberation, the jury determined that there were no mitigating factors sufficient to preclude the death penalty and that the trial court should impose a sentence of death.

The defendant's first contention on appeal is that the State failed to prove beyond a reasonable doubt that she was eligible for the death penalty in that she committed the murder in a cold, calculated, and premeditated manner.

*In reviewing the sufficiency of the evidence to support a finding of death eligibility, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements necessary to establish the defendant's death eligibility beyond a reasonable* doubt. People v. Emerson, 189 Ill. 2d 436, 474-75 (2000). Determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the trier of fact's responsibility. People v. Ramsey, 205 Ill. 2d 287, 292 (2002).

In this case, the defendant was found eligible for the death penalty solely under the aggravating factor in section 9--1(b)(11) of the Criminal Code. *Section 9--1(b)(11) of the Criminal Code provides for death penalty eligibility where (1) the defendant was 18 years or older at the time of*

the offense and where 2 "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5 9--1 b 11 West 1998 . The defendant does not dispute that she was over the age of 18 when she committed the offense. Rather, the defendant challenges that the murder was committed in a cold, calculated, and premeditated manner.

The terms cold and calculated and premeditated as used in section 9--1 b 11 of the Criminal Code provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not. People v. Williams, 193 Ill. 2d 1, 36 2000 . For a murder to be cold, it must be not motivated by mercy or the emotion of the moment. The defendant must kill without feeling or sympathy. People v. Brown, 169 Ill. 2d 132, 166 1996 . For a murder to be calculated and premeditated pursuant to a preconceived plan, scheme, or design, it must have been deliberated or reflected upon for an extended period of time. Williams, 193 Ill. 2d at 37. Words such as premeditated and design import forethought, careful reflection, or a deliberately arranged purpose, ideas all involving in their structures the essential element of time. Williams, 193 Ill. 2d at 31. A preconceived plan, scheme, or design is one that is thought out well in advance of the crime. Williams, 193 Ill. 2d at 31. As artfully explained by Representative Ed Petka during the legislative debates concerning section 9--1 b 11 , This provision is intended to apply to those situations in which a defendant basically takes the life of another person after deliberating upon it for extended periods of time. 85 Ill. Gen. Assem., House Proceedings, June 29, 1987, at 55 statements of Representative Petka .

In People v. Macri, 185 Ill. 2d 1 1998 , the supreme court upheld a finding of death penalty eligibility under section 9--1 b 11 where the defendant murdered a roommate with a crowbar. Ten months prior, the defendant had told a friend of his that he intended to hit the victim over the head with a crowbar, rape

her, steal her car, and flee to New York City, all of which eventually transpired. *Macri*, 185 Ill. 2d at 54.

In *People v. Haynes*, 174 Ill. 2d 204 (1996), the supreme court upheld a finding of death penalty eligibility under section 9--1(b)(11) where the defendant, over a period of days, contemplated the murder of a cosmetic surgeon. The defendant had decided to act out against perpetrators of fake Aryan cosmetics. *Haynes*, 174 Ill. 2d at 255. He selected a cosmetic surgeon out of the phone book and a few days prior to the crime made an appointment with the doctor under a false name. *Haynes*, 174 Ill. 2d at 255. The defendant shot the doctor during his appointment. *Haynes*, 174 Ill. 2d at 255.

In *People v. Williams*, 173 Ill. 2d 48 (1996), the supreme court upheld a death penalty eligibility finding under section 9--1(b)(11) where the defendant contemplated the murder of his ex-fiancée a day prior to shooting her. The day before the murder, the defendant had attacked his ex-fiancée and her new boyfriend with a butcher knife and threatened to kill them if he saw them together again. The next day, the defendant shot his ex-fiancée after seeing her with her new boyfriend at the mall.

In *People v. Brown*, 169 Ill. 2d 132 (1996), the supreme court upheld a finding of death penalty eligibility under section 9--1(b)(11) where the defendant devised a plan to murder a rival gang member several hours in advance. Three hours prior to the killing, the defendant had obtained a rental car and his accomplice had obtained a gun. *Brown*, 169 Ill. 2d at 166.

Whereas, in People v. Williams, 193 Ill. 2d 1 (2000), the supreme court overturned a finding of death penalty eligibility under section 9--1(b)(11) where the defendant and an accomplice entered a convenience store, robbed it, and shot the clerk. A video camera recording showed that the defendant took the store clerk behind the counter and shot her as she was opening the cash register drawer for him. Williams, 193 Ill. 2d at 38. However, there was no evidence that the defendant considered killing the store clerk " 'well in advance' [citation] of the crime." Williams, 193 Ill. 2d at 38.

In the present case, the jury could have found beyond a reasonable doubt that the defendant committed the murder in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means. The murder was certainly cold or *without feeling or sympathy. **F**urthermore, ample evidence supports that the murder was deliberated or reflected upon for an extended period of time* and had been planned out well in advance. Russell testified that when he returned to the bar around 7:15 p.m., the defendant was sitting with John. Shortly before Russell left the bar around 10 p.m., the defendant told him that she was going to kill John and that he was going to help. The defendant arrived home with John around 10:30 p.m. About one-half hour later, Russell observed the defendant and John in what appeared to be consensual sex. Russell pulled John off of the defendant and the two men struggled. As Russell was holding John, the defendant appeared with a knife and stabbed John in the chest numerous times. The defendant admitted to several of her cell mates that she decided to kill John because he had made her angry in the bar. John had touched her and she did not like that, because she is a lesbian. The defendant admitted to her cell mates that she invited John to her house so she could kill him and that she had led John to believe that they would have sex. In sum, the evidence was sufficient to prove the defendant eligible for the death penalty under section 9--(b)(11) of the Criminal Code.

The defendant's next contention on appeal is that the eligibility stage of her sentencing hearing was marred by constitutional error. More specifically, the defendant contends that due to inadequate jury instructions and misleading arguments by the State, the defendant was denied a fair sentencing hearing. The defendant argues that premeditation, pursuant to a preconceived plan, requires "both a substantial period of time and proof of reflection or deliberation" and that the jury instructions did not explain the

requirement of planning over time. Furthermore, the defendant argues that the State misinformed the jury when it stated that "a preconceived plan can occur ten seconds before the act actually occurs" and that "premeditation is simply making up your mind what you will do ahead of time."

The defendant has forfeited review of this claim. See People v. Enoch, 122 Ill. 2d 176, 185-87 (1988). During the instruction conference of the eligibility phase, the defense made no objection to the proposed jury instructions. Nor did the defense object when the State gave its supposed faulty argument. Furthermore, the defendant did not include these claims in any of her posttrial motions. The doctrine of waiver has been applied to errors made at the sentencing phase of a death penalty case. See Macri, 185 Ill. 2d at 72. Nevertheless, the defendant contends that the doctrine of plain error applies. We disagree.

The plain error doctrine applies when the evidence is closely balanced or when the error is of such magnitude that it deprives the defendant of a fair hearing. Macri, 185 Ill. 2d at 72. The evidence in this case was not closely balanced. The defendant contemplated the murder of her victim for several hours. She admitted to becoming upset sometime between 7:30 p.m. and 10 p.m. in the bar when John touched her. She then invited John home with her and made him believe that they would have sex, all the while intending to kill him. The defendant eventually carried out her plan sometime around 11 p.m., when she stabbed John after having sex with him. Furthermore, the alleged errors were not of such magnitude that the defendant was deprived of a fair hearing. First, the record reveals that the jury was given all of the appropriate instructions in the Illinois Pattern Jury Instructions manual. Second, the State's two isolated comments concerning the meanings of premeditation and a preconceived plan, even if arguendo they were inaccurate, could not have influenced the jury's decision. A review of the State's argument as a whole shows

that the State consistently argued that the defendant devised her plan to murder John several hours in advance. Accordingly, we do not believe that the defendant was deprived of a fair death penalty eligibility hearing.

For the foregoing reasons, the judgement of the circuit court of Boone County is affirmed.

Affirmed.

McLAREN and BYRNE, JJ., concur.